**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------ X
HAYLEY REED,                                                           :
                                                                       :
                                           Plaintiff,                  :          Civil Action No.:
                                                                       :
                    v.                                                 :
                                                                       :          **COMPLAINT**
FORTIVE CORPORATION, QUALITROL COMPANY                                 :
LLC, CEPHEID, PHENOMENEX, INC., PALL                                   :
CORPORATION, and ANDREW McCAULEY, in his                               :          <u>**Jury Trial Demanded**</u>
individual and professional capacities,                                :
                                                                       :
                                           Defendants.                 :
------------------------------------------------------------------------ X

Plaintiff Hayley Reed, as and for her complaint against Fortive Corporation ("Fortive"),

Qualitrol Company LLC ("Qualitrol") (Fortive and Qualitrol, together, the "Company"),

Cepheid, Phenomenex, Inc. ("Phenomenex"), Pall Corporation ("Pall") and Andrew McCauley,

hereby alleges:

<u>**PRELIMINARY STATEMENT**</u>

"We all have a role in building a community where everyone
belongs.  Where you can speak your mind, be yourself, and feel
supported.  It's how we achieve more together — for each other, for
our customers, and for the world."

- Fortive's Inclusion & Diversity Vision Statement[1]

1.       Fortive may "talk the talk" about everyone belonging, speaking one's mind and

feeling supported.  However, as Ms. Reed has learned over the past 19 months, neither Fortive

nor its 18 operating companies, including Qualitrol, "walks the walks" in this regard.

---

[1]      See https://www.fortive.com/inclusion-diversity.

2.     Andrew McCauley is the President of Qualitrol.  On August 21, 2019, during his very first day on the job, Ms. McCauley subjected Ms. Reed – Qualitrol's Digital Marketing and Marketing Communications Manager – to wildly inappropriate sexual advances.

3.     Specifically, Mr. McCauley repeatedly demanded that Ms. Reed join him in the bedroom of a corporate apartment rented out for him by Qualitrol.

4.     Ms. Reed declined Mr. McCauley's invitations and sexual advances.

5.     From that moment on, Ms. Reed, who was unquestionably a rising star at the Company, has been subjected to ongoing, blatant and undisguised retaliation.

6.     Things only got worse after Ms. Reed filed formal complaints with Fortive's Human Resources ("HR") and legal teams.  Among other things, the Company retained an "independent investigator," Lynn Kappelman, Esq., who has spent her entire career defending companies against claims of discrimination and harassment.

7.     To that end, the "Experience" section of Ms. Kappelman's attorney profile lists 43 successful representations of employers, and no representations of employees.  See https://www.seyfarth.com/people/lynn-a-kappelman.html?tab=experience.

8.     Worst of all, Ms. Kappelman was lead trial counsel in a sexual harassment case that received significant media attention surrounding the misconduct in which her partners engaged during the litigation.  See https://www.smh.com.au/business/banking-and-finance/anz-settles-with-former-trader-it-forced-to-divulge-her-rape-as-a-teen-20180823-p4zzam.html; https://www.stuff.co.nz/business/world/106109255/anz-trader-was-grilled-over-her-rape-as-part-of-us-sexual-harassment-case; https://www.law360.com/cases/577ee63c0c07a67cbb000002.

9.     Ultimately, Ms. Kappelman's client had to publicly apologize to the plaintiff prior to settling the matter.  Id.

2

10.    Understandably concerned that Ms. Kappelman was not actually impartial, Ms. Reed retained counsel and put the Company on notice of her intent to pursue litigation. Rather than do the right thing and remedy the situation, the Company, through its in-house counsel Doug Hicks, Esq., blew off Ms. Reed and her attorney.

11.    Moreover, the Company began unlawfully surveilling Ms. Reed. Specifically, on March 12, 2021, several monitoring programs and additional users were added to Ms. Reed's computer, including, *inter alia*, "impersonate user" and "discovery initiatives." A full copy of Ms. Reed's hard drive was removed from her system, domain peer use was set up, Ms. Reed's VPN user tokens were accessed, and desktop, hard drive, and cloud files were shared, read and/or written over.

12.    Then, on March 16, 2021 and March 19, 2021, Ms. Reed's work computer received three random "Patch" updates. Unlike every other Patch update Ms. Reed has received, these three did not permit or allow for Ms. Reed to "postpone" the updates. Following the updates, additional monitoring programs and users had been added to Ms. Reed's computer, including, *inter alia*, logging keystrokes, the ability to remotely turn on Ms. Reed's audio driver and the ability to see Ms. Reed's photos and audio. The programs also indicate that a "shadow copy" of Ms. Reed's hard drive had been made.

13.    Moreover, Ms. Reed's personal Gmail account, iCloud account and Apple ID, as well as her Microsoft 365 account and her photos, have all been accessed by foreign devices since she complained about Mr. McCauley's sexual advances. Upon information and belief, the Company is directing these attacks into Ms. Reed's personal devices and accounts.

14.    Given the foregoing, on April 8, 2021, Ms. Reed contacted Fortive's Board of Directors for assistance.  Not one Board member responded.  Thus, on April 12, 2021, Ms. Reed was constructively discharged.

15.    It is perhaps unsurprising that Ms. Reed's complaints of sexual harassment would be treated this way, as both Fortive and Qualitrol are companies run by men, and for men.

16.    Start with Fortive's "Corporate Leadership" team, which is 78% (7/9) male:


Jim Lico,
President & Chief
Executive Officer


Chuck McLaughlin,
Senior Vice President
& Chief Financial
Officer


Barbara Huilt,
Senior Vice President


Pat Murphy,
Senior Vice President


Wes Pringle,
Senior Vice
President


Read
Simmons,
Senior Vice
President,
Strategy


Jon Schwartz,
Senior Vice
President,
Corporate
Development


Peter Underwood,
Senior Vice
President &
General Counsel


Stacey Walker
Senior Vice
President,
Human
Resources

See https://www.fortive.com/fortive-leadership-team.

17.     This male-dominated leadership team is overseen by a male dominated (70%, 7/10) Board of Directors:



James Lico            Feroz Dewan            Sharmistha            Daniel Comas            Kate Mitchell
                                             Dubey

Rejji Hayes            Mitchell Rales            Steven Rales            Jeannine Sargent            Alan Spoon

See https://www.fortive.com/fortive-leadership-team.

18.     Moreover, Fortive's "Leadership" webpage is accompanied by a photograph that includes 88 men and only 7 women.



See https://www.fortive.com/fortive-leadership-team.

19.     Things are even worse at Qualitrol.  There are seven Vice Presidents (L1 employees) reporting into Mr. McCauley.  Every single one of them is a man.  Even worse, there are actually two women who report into Mr. McCauley – Ms. Reed is one of them – and *neither*

5

are Vice Presidents.  Put another way, every man who reports into Mr. McCauley (78%) is L1, and every woman who reports into him (22%) is L2.

20.     Thus, Qualitrol's organizational chart looks like this:



21.     It is within this context that the Company permitted Ms. Reed to be sexually harassed and retaliated against.  It is within this context that the Company continues to openly retaliate against and intimidate Ms. Reed in the hopes that she will simply "go away."

22.     She will not.

23.     Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL").

**J URISDICTION AND VENUE**

24.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State law pursuant to 28 U.S.C. § 1367(a).

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including employment practices alleged herein, occurred in this district.

## PARTIES

26.     Plaintiff, a resident of Monroe county, was Qualitrol's Digital Marketing Manager and Marketing Communications Manager.  At all relevant times Plaintiff was an "employee" or an "applicant" of Defendants within the meaning of those terms under the relevant statutes.

27.     Defendant Fortive Corporation is a Delaware corporation with a principal place of business in Everett, Washington.  At all relevant times Fortive was an "employer" or a "potential employer" of Plaintiff within the meaning of those terms under the relevant statutes.  Fortive is the parent company of Qualitrol, Cepheid and Phenomenex.

28.     Defendant Qualitrol Company LLC is a Delaware company with a principal place of business in Monroe County, New York.  At all relevant times Qualitrol was an "employer" of Plaintiff within the meaning of that term under the relevant statutes.  Qualitrol is one of Fortive's 18 operating companies.

29.      Defendant Cepheid is a California company with a principal place of business in Sunnyvale, California.  At all relevant times Cepheid was a "potential employer" of Plaintiff within the meaning of that term under the relevant statutes.  Cepheid is one of Fortive's 18 operating companies.

30.     Defendant Phenomenex Company is a California company with a principal place of business in Torrance, California.  At all relevant times Phenomenex was a "potential employer" of Plaintiff within the meaning of that term under the relevant statutes.  Phenomenex

is an operating company of Danaher Corporation ("Danaher").  Fortive was a part of Danaher until Fortive spun-off off of Danaher in 2016.

31.     Defendant Pall Corporation is a New York corporation with a principal place of business in Port Washington, New York.  At all relevant times Pall was a "potential employer" of Plaintiff within the meaning of that term under the relevant statutes.  Pall is an operating company of Danaher.

32.     Defendant Andrew McCauley is the President of Qualitrol Company LLC.  At all relevant times, Mr. McCauley was an "employer" of Plaintiff within the meaning of that term under the relevant statutes.

## ADMINISTRATIVE PROCEDURES

33.     Ms. Reed has filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in connection with Defendants' violations of Title VII. This action is being filed within 90 days of Ms. Reed's receipt of her Notice of Right to Sue from the EEOC.

34.     Any and all other prerequisites to the filing of these claims have been met.

## FACTUAL ALLEGATIONS

I.     **BACKGROUND**

A.     **Ms. Reed's Educational and Work Experience**

35.     In 2007, Ms. Reed received a Bachelors' Degree from the Nazareth College of Rochester.  She majored in International Business and Economics, with a minor in Marketing.

36.     Following her graduation, Ms. Reed received a certification in Trade Show Marketing, Event Management, from the University of Northern Illinois, as well as a Master's Degree (2011) in Strategic Marketing from Roberts Wesleyan College.

37.     Ms. Reed also studied International Strategic Marketing and Sales at the University of Copenhagen, Denmark.

38.     In addition to her education, Ms. Reed came to Qualitrol with significant relevant work experience.

39.     From 2007 to 2010, Ms. Reed worked as a Marketing Specialist at Harris RF, a global communications and information technology company that serves government and commercial markets in more than 125 countries.  While at Harris RF, Ms. Reed managed European Union government accounts, including NSA software for content creation, marketing campaigns and events and also designed and executed market research and user-experience initiatives for lead generation campaigns globally.

40.     In 2010, Ms. Reed joined Getinge, a leading global provider of products and systems that contribute to quality enhancement and cost efficiency in the healthcare and life sciences industries.  While at Getinge, working as a Senior Marketing Specialist, Ms. Reed managed all aspects of in and outbound marketing efforts driving discrete medical device sales and establishing re-occurring revenue streams.  She also worked to analyze and identify industry trends while working with Senior Leadership to innovate new compelling offerings, and was responsible for global content creation, including digital sales tools and interactive, e-commerce programs.

41.     Then, in 2012, Ms. Reed was hired as the Director of Marketing at Globalinx, a telecom company that provides services to global businesses and government agencies.  While at

Globalinx, Ms. Reed developed customer retention and distribution channel marketing strategies that resulted in an 18% increase in incremental revenue and a 5% increase in on-boarded channel partners.  She also managed all website, e-commerce, and channel marketing activities and created a very successful integrated marketing strategy.  Perhaps most impressively, Ms. Reed rebranded the entire organization, which resulted in multiple acknowledgements from the American Marketing Association: Rochester Chapter (Finalist in Branding, B2B Communications and Event Promotions) and the Rochester Business Journal for "Best Website."

**B.      Ms. Reed Is Hired By Qualitrol and Her Performance Is Outstanding**

42.      Given her education and experience, it should be no surprise that Ms. Reed was highly sought after by Qualitrol.

43.      In late 2014 or early 2015, Ms. Reed applied for the position of Digital Marketing Manager at Qualitrol.

44.      Ms. Reed first interviewed with Marissa Poe in HR, as well as the then-Vice President of Marketing, Steve Jennings.

45.      Thereafter, Ms. Reed was invited to interview in-person with various other senior leaders over the course of five hours, including, among others, Qualitrol's then-President, Raj Karanam.

46.      Ultimately, Ms. Reed was offered the position.

47.      It would be no understatement to say that Ms. Reed excelled at Qualitrol.

48.      Among other accomplishments, during her tenure Ms. Reed – who was responsible for all internal and external global marketing efforts across all time zones and six product offerings:

- Implemented Transformative Marketing and global commercial activities globally, in addition to being the

10

Marketing Data Privacy Coordinator lead for compliance with the General Data Protection Regulation and California Consumer Privacy Act.

- Redesigned Qualitrol's website, which, in 2018, was recognized by Fortive's Digital Marketing team as the best example of organic SEO across all of the Fortive Operating Company websites.

- Drastically improved Google optimization and Page Load Speed resulting in two different Marketing merit awards from Fortive.

- Managed and executed all digital activities across eight corporate websites, including all hosting, translation, digital and technical activities, in addition to 150+ microsites.

- Developed and led cross-functional programs in areas including, *inter alia*, Inside Sales, Sales Enablement, new market penetration, high growth markets, Field Service, software, prospecting, product integration, customer experience and software unification.

- Generated global marketing, lead generation and product portfolio plans including, *inter alia*, voice of customer, gap analysis, new product launches, product obsolescence, competitive landscape and activity, value creation and messaging in order to ensure sustained profitability.

- Developed technical documentation and content such as brochures, videos, podcasts, web, and marketing materials (2019 American Marketing Association: Rochester Chapter - Winner Best Influence Marketing Blog).

- Coordinated 75+ events globally per year ranging from virtual events, trade shows, seminars, and conferences resulting in a 500% increase in virtual engagement and a 24% increase in revenue in 2020.

49.     Ms. Reed's value to Qualitrol (and Fortive at large) was reflected in her performance reviews, pay increases and title changes.

50.     Each of Ms. Reed's performance reviews indicate that she is exceeding expectations (*i.e.¸* she has received higher than a "3," which correlates to "meets expectations," in each of her six annual performance reviews).

51.     Select comments from Ms. Reed's performance reviews include:

- Excellent job over-delivering on the target and pushing the sales organization in this regard!

- Hayley is a real asset to Qualitrol.

- Hayley is a reliable source of creative, innovative ideas for moving our brand and business forward. She and her ideas are valuable assets to Qualitrol and have real impact on our business results.

- Hayley made valuable contributions to our strategic planning process and helps push our thinking from a strategic perspective.

- [Hayley] accomplishes an impressive output given her relatively limited budget and team size.

- Hayley is a critical part of our Marketing organization.

- This was a tough year to drive growth, but Hayley was driving the effort throughout the year.

- Hayley has a knack for getting a tremendous volume of work done with a small and efficient team.

52.     As a result of her outstanding performance, over time Ms. Reed's annual base compensation rose from $92,000 to $98,000 to $105,000 to $115,000 to $117,000 ($25,000 increase over the span of six years).

53.     Ms. Reed's title was also changed to "Digital Marketing and Marketing Communications Manager," to reflect the fact that she has performed duties that far outstrip those related to digital marketing.

54.     In addition, Ms. Reed was given significant managerial responsibilities and ultimately had five employees, including Qualitrol's "Inside Sales" team, a Digital Marketing Specialist, a Graphic Designer, as well as multiple interns, reporting to her.

55.     Suffice it to say that Ms. Reed's future at Qualitrol was looking bright when, in August 2019, Andrew McCauley was hired to take over as the Company's President.

## II.     MS. REED IS SEXUALLY HARASSED BY QUALITROL'S INCOMING PRESIDENT, ANDREW McCAULEY

### A.     Ms. Reed Meets Mr. McCauley

56.     When Ms. Reed joined Qualitol, the Company's President was Raj Karanam.

57.     However, due to declining performance, Mr. Karanam was replaced in 2016 by Linda Rae.

58.     In the summer of 2019, Ms. Reed learned that Ms. Rae was "moving on" and Mr. McCauley would become the Company's next President.

59.     On August 21, 2019, an introductory "all-hands meeting" was held at Qualitrol's offices in Fairport, New York.  All of the employees working at that location, including Ms. Reed, attended the meeting to meet Mr. McCauley.

60.     After the "all-hands meeting," Ms. Reed approached Mr. McCauley and expressed her opinion that a broader communication effort should be made to the Qualitrol employees in other offices and its customer base, as well as a press release to drive more web traffic.

61.     Ms. Reed also suggested a "video blog," which was a method that Ms. Rae used to communicate to the entire Qualitrol organization.

62.     To her surprise, Mr. McCauley asked Ms. Reed whether she could shoot a video blog later that morning.

63.     Ms. Reed agreed and met with Mr. McCauley in his office about 30 minutes later.

64.     Ms. Reed explained the process for the video, which was for Mr. McCauley to speak facing the camera while using notes written on a whiteboard behind the camera.

65.     However, Ms. McCauley insisted that Ms. Reed be in the video with him and have the video take the form of an interview.

66.     This was extremely awkward, and Ms. Reed was uncomfortable, but she acquiesced to the new President's request.

67.     During the interview, Mr. McCauley spoke about his wife – who had been his "college girlfriend" – and children.

68.     Mr. McCauley also promised that the change in leadership would not impact the Company's business and that to the extent further changes would be made, such changes would be made "together."

69.     Ms. Reed was soon to learn that these promises would not apply to her after she rebuffed Mr. McCauley's sexual advances shortly thereafter.

**B.     <u>Mr. McCauley Invites Ms. Reed to Join Him in His Bedroom</u>**

70.     After the video shoot, Mr. McCauley asked Ms. Reed to go out to lunch with him to continue their discussion about marketing and public relations at Qualitrol.

71.     Ms. Reed was under the impression that the two would discuss work at McCardles, a restaurant that is right next door to Qualitrol's office.  However, when the two got outside, Mr. McCauley insisted that they eat in downtown Rochester and directed Ms. Reed to get into his rental car (a Mustang).

72.     A few minutes later, as the two were driving downtown, Ms. Reed asked Mr. McCauley what he was in the mood to eat.  To her surprise, Mr. McCauley said that he actually

14

wanted to go see the Company apartment that Ms. Rae used while she was employed by

Qualitrol.  He also told Ms. Reed that Ms. Rae had been terminated.

73.     This naturally made Ms. Reed very uncomfortable.

74.     Thankfully, the apartment complex had a restaurant called Branca in its lobby.

75.     Trying to avoid an awkward situation, Ms. Reed said that she would get the two

of them a table at Branca while Mr. McCauley viewed the apartment.

76.     Mr. McCauley refused this plan of action (twice) and demanded that Ms. Reed go

to see the apartment with him.

77.     When they got to the apartment, however, the card to get in did not work.

78.     Ms. Reed breathed a sigh of relief and suggested that the two simply have lunch.

79.     But, incredibly, Mr. McCauley was undeterred and forced Ms. Reed to

accompany him to the leasing office to get a functional key.

80.     He also started saying that he wanted Ms. Reed's "opinion" on the apartment,

which made absolutely no sense.

81.     After Mr. McCauley obtained a working key card, Ms. Reed again stated that she

would just get the two of them a table at Branca, but Mr. McCauley continued to insist that she

go with him to the apartment and physically steered her in that direction.

82.     At this point, Ms. Reed was incredibly uncomfortable.

83.     Thus, when they got into the apartment, she stayed at the end of the entrance

hallway so as not to go too far into the apartment with Mr. McCauley.

84.     Mr. McCauley then proceeded to enter the bedroom and told Ms. Reed to join him

in the bedroom.

85.     Ms. Reed refused.

86.     Mr. McCauley proceeded to ask Ms. Reed to join him in the bedroom four more times.

87.     Ms. Reed refused each time and finally just walked out of the apartment.

88.     The two then had lunch, during which Ms. McCauley continued to make inappropriate remarks to make clear that he was sexually interested in Ms. Reed.

89.     For her part, Ms. Reed continued to make clear that she would not submit to Mr. McCauley's sexual advances.

**C.      Ms. Reed Confides in Stacey Downs**

90.     Immediately upon her return to the office, Ms. Reed confided in Stacy Downs.

91.     However, given two prior experiences at Qualitrol, Ms. Reed decided not to file a complaint with HR.

- First, in 2016, Ms. Reed became concerned that Kurt Rohmann, a Product Manager at Qualitrol, was violating email marketing compliance rules. She reported this to Mr. Rohmann's supervisor, Vice President Joseph Mbuyi, and warned that she would cut Mr. Rohmann's access to certain content if he did not stop his problematic conduct. When Mr. Rohmann nevertheless continued to engage in the problematic conduct, Ms. Reed restricted his access to certain information to prevent the conduct from continuing. Mr. Mbuyi became enraged, called Ms. Reed and directed obscenities towards her, including referring to her as a "bitch" and a "princess." Ms. Reed complained about this conduct to HR and news of her complaint spread like wildfire. The entire senior team learned about the complaint and the former Vice President of Sales, Ramy Ahmed, told Ms. Reed that it was a "very big career mistake to complain about" being called a bitch. Ms. Reed's own manager at the time, Ashish Kulsrestha, told Ms. Reed "You're a smart girl, you work at an international company. As a woman you have to just get used to things like this."

- Second, in 2017, Ms. Reed organized an informal, in-office baby shower for the then-pregnant Product Manager (now the Director of Operations, Lori Rosario). When the Vice

President of Operations, Dick Kloc, learned about this, he furiously confronted Ms. Reed and, standing over Ms. Reed, began screaming directly into her face from mere inches away. Apparently, he was concerned that the baby shower would somehow impact productivity. Ms. Reed tried to explain that office baby showers had been held previously at Qualitrol, but he would have none of it, and remarked, "this is a place of business. We are here to make money. What's next? We start renting out the conference rooms for weddings and Bar Mitzvas?" Ms. Reed finally said, "it's just a fucking baby shower, Dick," which made him even more furious. Mr. Kloc's conduct was so vicious that people outside of Ms. Reed's office raced to get her then-manager, Vice President of Marketing, John Tesoro, who came and tried to calm things down. However, after the fact, Mr. Tesoro told Ms. Reed that *she* would have to apologize to Mr. Kloc and, that if she failed to do so, Mr. Kloc would make her life a "living hell." Even though Ms. Rae, who was ostensibly Mr. Tesoro's supervisor, told Ms. Reed that she did not need to apologize, Mr. Tesoro continued to insist that she do just that. When Ms. Reed swallowed her pride and apologized, Mr. Kloc outrageously told her that she needed to work on her "emotional intelligence" because she was crying when he was screaming at her.

92.     Given her past experiences at Qualitrol, as well as the fact that Mr. McCauley was the brand-new President of the Company, Ms. Reed determined that the best course of action would be to simply put her head down and work as hard as possible to shift Mr. McCauley's focus away from his sexual interest and to her work product.

93.     Ms. Reed was particularly concerned because nothing at Qualitrol remains confidential and she was worried that colleagues would think that she actually did do something sexual with Mr. McCauley.

94.     Unfortunately, however, Mr. McCauley soon began retaliating against Ms. Reed because she turned down his sexual advances.

### III.     MS. REED SUFFERS BLATANT RETALIATION

#### A.     Mr. McCauley Refuses to Backfill a Digital Marketing Manager Position

95.     One of the positions reporting into Ms. Reed was a Digital Marketing Specialist.

96.     In spring 2019, the then-Digital Marketing Specialist, Sean Wallace, left the Company.

97.     At the time that Mr. McCauley was hired, Ms. Reed was interviewing for his replacement.

98.     By October, the list had been narrowed to only one candidate who had been interviewed by Ms. Reed's supervisor, Vice Present of Marketing, Gary Anderson.

99.     Then, however, shortly after Ms. Reed rebuffed Mr. McCauley's sexual advances, he advised her that she would no longer be permitted to backfill the Digital Marketing Specialist role, and that she could only hire a "Marketing Specialist."

100.     Ms. Reed resubmitted the job requisition as requested, and everyone other than Mr. McCauley signed off on it.

101.     However, Mr. McCauley did another about face and told Ms. Reed she actually could not hire anyone to this role.

102.     Mr. McCauley claimed that there was no room in the budget for the role. However, Ms. Reed, who was actually responsible for the budget in 2019, knew that this was untrue because the role was already accounted for in the budget.

103.     Around the same time, Mr. McCauley terminated Mr. Anderson.

104.     Outrageously, when Mr. McCauley informed Ms. Reed that Mr. Anderson would be terminated, he stated: "Gary didn't do you any services.  He doesn't have the same feelings about divorce that I do."

105.    This was a completely inappropriate reference to the fact that Mr. Anderson was very religious, and Ms. Reed was going through a divorce at the time.

106.    Ms. Reed began reporting directly to Mr. McCauley, at which point things really started to go downhill.

**B.      Ms. Reed Is Removed from All Strategic Planning Conversations and Sales Marketing Meetings**

107.    Each year, beginning in the summertime and running through September, Qualitrol prepares a strategic plan for the upcoming year.

108.    Prior to Mr. McCauley's arrival, Ms. Reed led the strategic planning effort along with Ms. Downs.

109.    This was, of course, a high profile and high visibility role because, among other reasons, each year Qualitrol's strategic plan was presented to the office of the Chief Executive Officer at Fortive.

110.    After Ms. Reed rejected Mr. McCauley's sexual advances, she was completely shut out of the strategic planning in 2019 for 2020.

111.    In 2020, she was not even invited to participate in any way in the strategic planning for 2021.

112.    To be clear, the process surrounding strategic planning had not changed – Ms. Reed was simply removed from the process.

113.    Similarly, starting in 2020, Ms. Reed was removed from all of the Sales meetings she had previously attended.

**C.      Ms. Reed's 2020 Budget Is Slashed**

114.    Particularly given the loss of her Digital Marketing Specialist, it was critical heading into 2020 that Ms. Reed had an adequate budget to perform the functions of her team.

115.    Ms. Reed did not expect this to be a problem, as her budget had remained stable in years past.

116.    Unfortunately, however, Mr. McCauley decided to slash Ms. Reed's budget both overall and in specific critical areas.

117.    In total, even before the pandemic hit, the marketing budget was cut nearly $1mm.

118.    With respect to Trade Show work specifically, a $250,000 budget was cut to $180,000 and then again to $160,000.

119.    Other teams did not experience budget cuts anywhere near as significant as those imposed upon Ms. Reed.

120.    Outrageously, Ms. Reed's budget was gutted again in 2021.  For example, she now has a budget of only $75,000 for Trade Show work.

**D.**    **Ms. Reed's Policy Deployment Initiative Goes Completely Unsupported**

121.    Following the finalization of the strategic plan, each of the Fortive operating companies creates a handful of goals – known at Fortive as Policy Deployment ("PD") Initiatives – that are designed to be in furtherance of the approved strategy plan.

122.    Each PD Initiative has an assigned leader who is responsible for the achievement of the PD Initiative.

123.    The leaders of each PD Initiative are first required to develop and participate in an event related to the PD Initiative called President's Kaizen.

124.    Following the President's Kaizen, the leaders of each PD Initiative must work to accomplish the assigned process improvement and goal and are required to provide progress reports to leadership during monthly meetings.

125.    These monthly progress reports are, in turn, relayed to Fortive.

126.    Ms. Reed was responsible for PD Initiatives in 2017 and 2018, and her Inside Sales Manager, Matt Munson, was responsible for a PD Initiative in 2019.

127.    Ms. Reed was very successful in connection with her work on those PD Initiatives and, in part because of that success, Ms. Reed received a promotion to expand and manage the Inside Sales team in 2019.

128.    In February 2020, only one week before the President's Kaizens were supposed to commence, Ms. Reed was told she would be responsible for another PD Initiative in 2020.

129.    While this would generally be considered an honor, the timing of the disclosure left Ms. Reed just one week to prepare and execute the President's Kaizen.

130.    More importantly, the PD Initiative given to Ms. Reed was completely unreasonable.

131.    Specifically, Ms. Reed was tasked with increasing non-flow revenue an absurd 125%, from $1.7mm to $3.85mm.

132.    Generally, revenue increase goals are in the neighborhood of 18%.

133.    To add insult to injury, while PD Initiative responsibility virtually always comes with an increased budget and/or headcount, as noted, Ms. Reed's budget and headcount had been cut.

134.    Finally, to make things even more difficult, Mr. McCauley also assigned a performance goal to the Inside Sales team that reported to Ms. Reed.  Of course, Ms. Reed was effectively responsible for that goal as well, which was to increase incremental revenue a whopping 333%, from $1.5mm to $5.2mm.

135.    In order to be successful with respect to these PD Initiatives with a reduced budget and headcount, as well as successfully perform her core function supporting all product lines and employees in all time zones, Ms. Reed had to put in an inordinate amount of time and regularly worked 15+ hours per day throughout the first three quarters of 2020.

136.    Moreover, this was during the height of the pandemic during which Ms. Reed also had to organize and host myriad webinars and work on countless COVID-related communications.

137.    Rather than support her, Mr. McCauley intentionally made Ms. Reed's life more difficult by, among other things: (i) demanding that she focus heavily on organic Search Engine Optimization ("SEO"), but refusing her request to hire someone to assist in that endeavor; and (ii) forcing Ms. Reed to participate in and lead a digital marketing event for Fortive in June 2020 even after she specifically asked to be excluded.

138.    To put a fine point on how little concern Mr. McCauley had for Ms. Reed's PD Initiative, he stopped the monthly update meetings altogether after September 2020.

139.    Moreover, he admitted, in writing in a PD Initiative Evaluation Form, that he "did not treat [Ms. Reed's PD Initiative] like a PD initiative and resource [it] as a priority."

140.    Despite these hurdles, Ms. Reed was able to substantially increase non-flow revenue (from $1.7mm to $2.8mm) and create an $11mm funnel of non-flow business.

E.    **Mr. McCauley Provides No Support when Ms. Reed Identifies the Falsification of Incremental Revenue**

141.    Meanwhile, Ms. Reed was becoming more involved in assisting Inside Sales with respect to incremental revenue in connection with their performance goals.

142.    As a result, she learned both that the Inside Sales team was way behind with respect to their goals and that the Inside Sales team was falsifying incremental revenue.

22

143.    Ms. Reed attempted to remedy the problem by providing coaching to Mr. Munson.  However, Mr. Munson was not receptive.

144.    Ms. Reed also approached Kevin Blanton, Qualitrol's Sales Director of the Americas.  Mr. Blanton confirmed Ms. Reed's suspicion that the Inside Sales team was falsifying incremental revenues; specifically, that only $370,000 of the $1.5mm of reported incremental revenue in 2019 was actually incremental.  Mr. Blanton also stated that he had informed Mr. McCauley – in writing, subsequently forwarded to Ms. Reed – about this. According to Mr. Blanton, Mr. McCauley said he was going to count it all as incremental even though it was not.

145.    Ms. Reed then had a series of meetings with HR about the problem and, on October 9, 2020, presented Mr. McCauley and Qualitrol's Vice President of HR, Thomas Hodge, with a written proposal to restructure the Inside Sales team in a way that would save money and increase efficiency, including assigning certain marketing tasks to the Inside Sales team that would alleviate her own exorbitant workload and result in a $150,000 cost savings.

146.    Although he asked for time to "think it over," he apparently never did.

147.    Ms. Reed followed up twice more.  Mr. McCauley told her she would not hear anything for another week or two.

148.    Then, in November 2020, Ms. Reed received urgent messages from Mr. McCauley in which he asked her to call him on his cell phone.  Ms. Reed did so, and Mr. McCauley told her that he had "good news" and "bad news."

149.    The "good news" was that he was terminating Mr. Munson, removing the Inside Sales team from her purview and moving it under Mr. Blanton.  This, of course, was not actually

"good news" for Ms. Reed because it meant she was being stripped of additional direct reports and resources.

150.    The "bad news" was that Mr. McCauley had decided to terminate Alan Gray, a U.K.-based graphic designer.  This truly was bad news, because Mr. Gray was another of Ms. Reed's direct reports and a critical member of the team who assisted with graphic design, content generation and digital activities.

151.    Ms. Reed told Mr. McCauley that this decision made absolutely no sense and that Mr. Gray was a vital member of her team.  Mr. McCauley would not hear it.  He insisted that Mr. Gray needed to be terminated and that Ms. Reed needed to carry out the termination.

152.    Mr. McCauley further claimed that Mr. Gray needed to be terminated in order to free up money to hire a "digital marketing person."  However, a digital marketing person would cost more than three times what Mr. Gray was being paid and Ms. Reed had already proposed restructuring plans (ignored by Mr. McCauley) that would have resulted in savings sufficient to cover the salary of a digital marketing person.

153.    Nevertheless, Mr. Gray was fired.

154.    Mr. McCauley later claimed that Ms. Reed "misunderstood him" when he stated that he would hire a digital marketing person and the jobs that have been posted since are scheduled (if ever hired) to report into Ms. Downs, and not Ms. Reed.

155.    To cap it off, Ms. Reed was later told that the role would likely be changed to a Technical Content Writer role and report to someone different altogether.

F.    **Ms. Reed Is Not Even Informed About a Workshop During Which Her Work Is Presented**

156.    After receiving Mr. McCauley's draft PD Initiative Evaluation Form in October 2020, Ms. Reed called Qualitrol's Director of Operations, Lori Tamarez (née Rosario), to raise concerns about the content of the draft.

157.    Specifically, Mr. McCauley's draft downplayed Ms. Reed's achievements, gave the Sales team credit for her hard work and indicated that the PD Initiative had never been deployed to an "L2" employee even though Ms. Reed was, in fact, an L2 employee.

158.    Ms. Tamarez agreed with Ms. Reed and further asked whether the Evaluation Form was being prepared for the upcoming Policy Deployment Training Workshop event.

159.    Ms. Reed had never even been told that a Policy Deployment Training Workshop event had been scheduled and reached out to Ms. Downs, her peer, about the event.

160.    Ms. Reed still was not invited to the event, even though many of her peers attended, and Mr. McCauley actually presented on Ms. Reed's work to her colleagues.

161.    This exclusion, of course, made Ms. Reed look terrible and expendable.

162.    After this, Ms. Reed expressed her frustration to Ms. Downs in a message over the "Teams" application.  Ms. Downs conveyed that she had suggested to the VP of Sales, Harshad Kharche, that Ms. Reed attend an upcoming Fortive Growth Conference.  This was the first time that Ms. Reed had learned about the Growth Conference despite the fact that she later learned that the entire conference was about Marketing.

163.    Ms. Downs agreed that it was "weird" that Ms. Reed had not been nominated by Mr. McCauley to attend the conference.

### G.    Ms. Reed Is Excluded from Monthly Innovation Forum Meetings

164.    In January 2021, during a conversation with Qualitrol's Vice President of Research and Development, Anis Zribi, Ms. Reed learned that Mr. Zribi had set up monthly Innovation Forum calls that were being run by Ms. Downs.

165.    Specifically, Mr. Zribi stated that Ms. Reed had many great ideas and asked her why she was not on the call.  These calls had been set up months before, in the summer of 2020.

166.    This was yet another call, meeting and/or event about which Ms. Reed had never been informed and to which Ms. Reed was not invited.

167.    Ms. Reed followed up by emailing Ms. Downs, copying Mr. Zribi, and asked to be invited to the meeting.  Ms. Downs made clear that she did not want Ms. Reed involved in the call and only agreed to invite Ms. Reed after she confirmed, in writing, that she would not speak during the call.

### H.    Ms. Reed Is Stripped of Further Resources, as Well as Her Ownership of the Marketing Budget

168.    Shortly after Ms. Reed was excluded from the aforementioned conferences, Ms. Tamarez sent out an email indicating that the President's Kaizen for 2021 would be occurring even earlier in the year than normal.

169.    Ms. Reed, however, had never even seen or been given access to the 2021 strategic plan or the action plans associated with the initiatives upon which the President's Kaizen would be based; a plan that she had been responsible for putting together in years past.

170.    She also had not been given any information about the President's Kaizen.

171.    Meanwhile, Ms. Reed, who in years past had ownership of the marketing budget, was not even permitted to have a copy of it.

172.    The Finance team specifically denied her requests for a copy of the budget, and Ms. Downs, who apparently had access to the budget, refused to provide Ms. Reed with information that she needed to plan for 2021.

173.    Ms. Reed then received an invite from Tom Linehan, a Finance Manager, to a meeting with himself, Ms. Reed, Ms. Downs, Mr. McCauley and Shane Murphy, Qualitrol's Vice President of Finance.  During this meeting, Ms. Reed was shown a copy of the budget at a very high level.  This was completely unhelpful because, as Ms. Reed pointed out, it did not give her enough information to determine which purchase orders she could submit and approve.

174.    To her dismay, Ms. Reed later learned (in March 2021) from Carlos Deligi, Sales Director of South America, that the decision to strip Ms. Reed of her ownership over the budget had been made as far back as the summer of 2020, and yet had never been communicated to Ms. Reed.

I.    **Ms. Reed's Role Is Virtually Eliminated Without Her Knowledge**

175.    As noted above, Ms. Reed was completely cut out of the strategic planning for 2021.  She also was left out of company-wide action plans and, critically, marketing activities that were previously under her purview were not being performed by other teams without her knowledge.

176.    In February 2021, Ms. Reed further learned that the entire process for marketing products had changed in the summer of 2020 without her knowledge.

177.    Whereas Ms. Reed was heavily involved in the old process, Tollgate, she was completely left out of the new process, Agile Sprints.

178.    This resulted in various product launches and marketing plans about which Ms. Reed was never informed or consulted.

27

179.    Ms. Reed also learned that the sales team had begun doing its own marketing (including making their own graphics that do not even follow brand guidelines, as well as working with distributors to do marketing), completely cutting her out of the process.

180.    Ms. Reed then signed into "Miro," a virtual whiteboard in which employees can be grouped into "teams" for easy collaboration.

181.    Ms. Reed discovered that all of her peers and even former direct reports were assigned to the team called "Fort."  Ms. Reed was not only not assigned to Fort – she was not assigned to any team at all.

182.    Ms. Reed was able to see on Miro that numerous projects, trainings and initiatives with which she should have been involved had been performed without her knowledge.

183.    Relatedly, Ms. Reed also learned that she had been replaced by Ms. Downs with respect to certain value proposition work previously performed by Ms. Reed.  This was a major blow because this highly visible work was performed alongside Fortive.

184.    Similarly, Ms. Reed had been cut out of a recent Customer Communications Kaizen, which, had she been invited, would have involved working directly with members of Fortive's Digital Marketing team.

185.    Even worse, Ms. Reed discovered that Mr. McCauley was holding monthly "Marketing" Key Performance Indicator meetings, but, even though Ms. Reed is literally the only person that actually does marketing, she was not invited.  Instead, Ms. Downs and her team of Product Managers were invited.

J.      **Ms. Reed Suffers Retaliation in Connection with Other Job Opportunities**

186.    After learning that the entire process for marketing products had changed without her knowledge, Ms. Reed began looking for other opportunities within the Fortive network of companies.

187.    Ms. Reed first reached out to Julie Prex, the Vice President of Marketing at Industrial Scientific, a Fortive Operating Company.  Ms. Prex initially stated that she would "love" to have Ms. Reed on her team and would introduce Ms. Reed to Marc Osgoodby, Industrial Scientific's Vice President of Sales.  Ms. Prex also indicated that she was familiar with Mr. McCauley and had actually heard him present on Ms. Reed's work and pass it off as his own.  Despite multiple follow ups, nothing materialized with Ms. Prex.

188.    Ms. Reed also reached out to Kristi Flores, the Vice President of Marketing at Tektronix, another Fortive Operating Company.  Ms. Flores told Ms. Reed that she believed that Ms. Reed would "be great" for an open Director of Field Marking position.  Ms. Flores, however, never circled back on the position and literally did not even respond to Ms. Reed's attempted follow-ups.

189.    Having no success within the Fortive network of companies, Ms. Reed expanded her outreach to Danaher Operating Companies.  Among approximately 30 applications, Ms. Reed was contacted by Cepheid, Phenomenex and Pall Corporation.

190.    Ms. Reed had an initial call with Danaher's HR recruiter who suggested that she apply for positions with Cepheid and Phenomenex.

191.    Ms. Reed never heard back from Cepheid.

192.    Phenomenex was looking to fill a position that required someone with Gas Chromatography experience, which Ms. Reed actually had.  Ms. Reed was told that the position

had been open for months and that Phenomenex would like to interview her for it.  All of a sudden, Phenomenex went dark and ceased responding to Ms. Reed's emails.

193.    At Pall Corporation, Ms. Reed had three successful interviews and was well on her way to an offer until, upon information and belief, Victor A. Maurtua, Pall Corporation's Vice President of Strategy and Business Development, contacted Mr. McCauley.

194.    After that, Pall Corporation also went dark, even though Ms. Reed was told that she would receive a response by February 12, 2021, and then February 19, 2021.

195.    It was not until March 2, 2021, only 40 minutes after Ms. Reed's first interview with Ms. Kappelman (as described in detail below), that Ms. Reed was told by an HR representative at Danaher that she would receive feedback on the open position the next day.

196.    Ms. Reed was then told that she did not get the position for which she interviewed, but that a senior leadership role was opening at Pall Corporation and that the company would redefine the role specifically for Ms. Reed.

197.    On March 5, 2021, Ms. Reed was told that she would be receiving additional information concerning this new role "shortly."

198.    However, after Ms. Reed's second interview with Ms. Kappelman (and after she put the Company on notice of her decision to retain legal counsel) no one at Pall Corporation has since followed up with Ms. Reed about the role.

**K.    Ms. Reed Is Retaliated Against in Connection with the Global Sales Meetings**

199.    Around the same time, Mr. Blanton and Mr. Kharche were planning a beginning-of-the-year kickoff sales meeting for February 22-24, 2021.

200.    At first, Ms. Reed was scheduled to present for 30 minutes at the end of the first day of the three-day event.

201.    However, without consultation with Ms. Reed and while she was on paid time off, Ms. Reed's presentation was moved to the end of the last day of the event.

202.    Naturally, more than half of the participants did not even attend this final presentation, and Ms. Reed's time was cut to 15 minutes.

203.    To add insult to injury, Ms. Reed was not invited to a single one of the various "breakout" meetings during the conference even though she had specifically explained that she had a new prospecting tool about which she needed to train the sales team.

**L.    Ms. Reed Was Given Virtually No Performance Feedback During 2020**

204.    The regular practice at Qualitrol is for managers to hold quarterly performance feedback meetings with employees, in addition to mid-year and annual reviews and "career leveling" discussions.

205.    Moreover, at the outset of each year managers are required to provide performance and development goals to their direct reports.

206.    Mr. McCauley even stressed during a recent meeting that performance feedback is a "requirement" and that he and the Senior Leadership Team had spent four hours reviewing each department and L2 employee.

207.    Mr. McCauley was so disinterested in Ms. Reed – who was an L2 employee – that he: (i) failed to provide the required performance and development goals for 2020; (ii) failed to hold quarterly performance feedback meetings during 2021; (iii) failed to hold a "career leveling" meeting with Ms. Reed, even though he held them with people who did not even report to him; and (iv) failed to even provide Ms. Reed with a 2020 performance review until after she lodged a complaint of discrimination, as described below.

208.    As put best during a March 4, 2021 call with the Vice President of Global Sales, Hashard Kharche, Ms. Reed was "pretty much by [her]self."

## IV.    MS. REED FILES A COMPLAINT OF DISCRIMINATION AND RETALIATION

### A.    Ms. Reed Complains Internally at Fortive

209.    In February 2021, amidst much of the retaliation described above, Ms. Reed reached out to Tony Stohlmeyer, the Vice President of Human Resources at Fortive, Precision Technologies.[2]

210.    Ms. Reed informed Mr. Stohlmeyer that she needed to speak with him about an important matter.

211.    Ms. Reed then met with Mr. Stohlmeyer on February 8, 2021 and relayed to him that she had been sexually harassed by Mr. McCauley and retaliated against for refusing his advances.

212.    Mr. Stohlmeyer looped in Mr. Hicks, General Counsel at Fortive, Precision Technologies.  Mr. Hicks spoke with Ms. Reed on February 12, 2021.

213.    Despite knowing the severity of the situation, Mr. Hicks told Ms. Reed that he expected their call to last only 10-15 minutes.  Thus, not surprisingly, Mr. Hicks ran out of time for the call before Ms. Reed got through the entire series of events.  Ms. Reed offered to call Mr. Hicks back later in the afternoon, but he declined and the two did not reconnect until after Ms. Reed returned from paid time off, on February 22, 2021.

---

[2]    This was the second internal complaint made by Ms. Reed to Fortive.  Shortly after the first complaint, a purportedly anonymous complaint made pursuant to Fortive's "Speak Up" process, certain of Ms. Reed's responsibilities related to the substance of her complaint were stripped.

214.   Notwithstanding that he cut the call short, Mr. Hicks had more than enough

information to begin an investigation into Ms. Reed's claims.

215.   Indeed, Qualitrol's own handbook says that individuals who complain about

sexual harassment should receive a satisfactory response within five days.

216.   Yet, this never happened in Ms. Reed's case.  Instead, Ms. Reed was required to

follow-up on February 25, 2021, with an email summarizing her complaints.

217.   In her February 25, 2021 email, Ms. Reed requested clear answers with respect to

the plan to cease the retaliation:

> Hi Doug – I need to understand concrete next steps, timeline and
> what remedial action is going to be done by Fortive. It's been 3
> weeks since I first reported this and although I have been
> communicated that this will be investigated, I have no idea by
> whom, when or what actions are going to be taken to ensure this
> retaliation stops immediately. I have had two interviews with you,
> and an interview with Tony Stohlmeyer summarizing this hostile
> work environment and retaliation, which I will again summarize, as
> it seems to be downplayed:
>
> Andrew, the President of my company misled me into his rental
> car, and took me to a company-paid apartment where he insisted that
> I join him in the apartment – twice,  and into the bedroom - twice.
> After I rebutted his unwanted sexual advances in the apartment,
> Andrew fired my direct manager resulting in me directly reporting
> to him.
>
> Since the incident of sexual misconduct/harassment, I have endured
> 18 months of retaliation including the following examples (broadly
> summarized) below.
>
> - I have been given unattainable performance goals (increase
>   revenue by 125%)
>
> - I have been removed from on-going responsibilities with no
>   communication as to why
> - My budget has been taken to a level that is Fortive-
>   recognized inoperable

- My team and headcount have been removed from underneath me

- My current role/responsibilities has been taken to a level that is Fortive-recognized too lean and unsustainable

- I have been demoted from a Manager to an Individual Contributor

- I have been excluded from developmental training directly impacting my role/department

- I have been asked to violate UK labor laws to fire a long-standing employee – voiced concerns to both Andrew and HR multiple times[3]

- Excluded from providing input into key decisions impacting my job/department

- Denied access to cross-department attended meetings that directly impact my role/department

- Denied access to information that impacts my job/department that I had access to prior with no explanation as to why

Do you agree that sexual advances, sexual harassment, sexual misconduct and retaliation are inappropriate from an OpCo president to a subordinate?

I need clear answers/actions on how this retaliation will immediately stop.  At this point, if this can't be resolved internally, I feel that I will be forced to explore external options.

218.    After a number of follow-up emails, it was not until March 1, 2021 – three weeks

after her initial complaint – that an "independent" investigator was assigned to her complaint.

---

[3]     This related to the termination of Mr. Gray.  In the U.K., an employee can be terminated only after he/she is provided with a business justification and an opportunity to be heard on potential alternatives to termination.  In Mr. Gray's case, at Mr. McCauley's express direction, the business justification was tales and he also was provided false explanations for why none of his proposed alternatives would be feasible.  Karen Mooney, Qualitrol's HR presence in Ireland, agreed with Ms. Reed that the business justification to terminate Mr. Gray made no sense.

B.    **Fortive's Biased Investigator**

219.    Ms. Reed then learned that the "independent" investigator chosen to look into her complaint – Lynn A. Kappelman, a Partner at Seyfarth Shaw, LLP – was an attorney who had spent her entire career defending companies against discrimination and harassment complaints.

220.    Ms. Kappelman's attorney profile includes, *inter alia*,

> Clients can rest easily when facing a trial if they are working with Lynn, a seasoned trial attorney and chair of the firm's Trial group. She is the one you want to run your trial when your back is against the wall.
>
> Lynn brings to each case the knowledge of what it takes to go to trial and win. She manages a number of large, national client portfolios, providing strategic and efficient support for clients in their employment litigation matters across the country, whether large or small, simple or complex. She also has significant experience working on noncompete and trade secrets litigation, taking many cases to evidentiary hearing and trial.
>
> Lynn began her practice as a commercial litigator, but since the 1990s, her practice has focused on employment litigation, trials, class action discrimination cases, noncompetition, and trade secrets disputes. She has handled multiplaintiff and class action trials, as well as single-plaintiff trials and arbitrations in state and federal courts all across the country.

See https://www.seyfarth.com/people/lynn-a-kappelman.html.

221.    Moreover, the "Experience" section of Ms. Kappelman's attorney profile lists 43 successful representations of employers, and no representations of employees.

222.    Worst of all, Ms. Kappelman was lead trial counsel in a sexual harassment case that received significant media attention surrounding the misconduct in which her partners engaged during the litigation.  See https://www.smh.com.au/business/banking-and-finance/anz-settles-with-former-trader-it-forced-to-divulge-her-rape-as-a-teen-20180823-p4zzam.html;

https://www.stuff.co.nz/business/world/106109255/anz-trader-was-grilled-over-her-rape-as-part-of-us-sexual-harassment-case; https://www.law360.com/cases/577ee63c0c07a67cbb000002.

223.    Ultimately, Ms. Kappelman's client had to publicly apologize to the plaintiff prior to settling the matter.  Id.

224.    Ms. Reed was so taken aback by the Company's choice for an "independent" investigator that she asked Mr. Hicks whether she needed her own attorney.  Mr. Hicks indicated (falsely, as it turns out) that she did not.

**C.    Ms. Reed Meets with Ms. Kappelman**

225.    Notwithstanding her hesitation, Ms. Reed met with Ms. Kappelman on March 2, 2021.

226.    During this meeting, Ms. Reed relayed almost all of the above.

227.    Despite claiming that she was an "independent" investigator, it quickly became clear that Ms. Kappelman was not, in fact, independent.

228.    Rather than simply asking for the facts, Ms. Kappelman's tone and line of questioning made clear that her goal was to undermine Ms. Reed and her claims, not to independently investigate them.

229.    By way of example only, Ms. Kappelman repeatedly suggested that Mr. McCauley's conduct would somehow have been appropriate had Ms. Reed not stated to him explicitly that she was uncomfortable.

230.    Ms. Kappelman repeatedly raised her voice when pursuing this line of inquiry.

231.    Ms. Kappelman also suggested that it was improper for Ms. Reed to assume that Mr. McCauley was acting with malintent when he repeatedly asked her to join him in the apartment bedroom.

232.     She further suggested that Mr. McCauley might simply have been looking for Ms. Reed's opinion on the bedroom's décor.

233.     Perhaps most outrageously, at one point Ms. Kappalemen suggested that Ms. Reed might have simply misunderstood Mr. McCauley's sexual advances because she was not yet used to his "management style."  This question was entirely inappropriate and illustrated the lengths to which Ms. Kappelman would go to fabricate non-nefarious rationales for Mr. McCauley's obviously inappropriate behavior.

**D.     Mr. Stohlmeyer Refuses to Meet with Ms. Reed**

234.     Ms. Reed was so shaken by the way she was treated by Mr. Hicks and Ms. Kappelman that, on March 4, 2021, she reached back out to Mr. Stohlmeyer.

235.     After Mr. Stohlmeyer initially declined her meeting request, Ms. Reed specifically asked to speak with someone in HR rather than legal.

236.     Mr. Stohlmeyer responded by stating that while Ms. Reed was welcome to speak with Qualitrol's HR, any communications concerning her complaints would have to be directed through Mr. Hicks or Ms. Kappelman.

237.     Finally, Ms. Reed came right out and wrote:

> I understand – during the interview call with Lynn, some of the questions and comments seemed…not unbiased.
>
> I want to talk to someone in HR not legal. I don't feel comfortable talking to Tom Hodge, as I know him and Andrew are friends.

238.     Mr. Stohlmeyer never even responded.  This was in direct violation of Qualitrol's own policies, one of which states:

> If for any reason you do not feel comfortable speaking with your supervisor or the designated management assigned in any step of this (open communication) policy, you should feel free to discuss

your concerns with any other member of management with whom
you feel comfortable.

**E.**     **Ms. Reed Meets with Ms. Kappelman for a Second Time**

239.     Though she was stuck with Ms. Kappelman, Ms. Reed was determined to right

the foregoing wrongs.

240.     To that end, on March 5, 2021, Ms. Reed sent Ms. Kappelman some of the

documentation supporting her claims.

241.     Ms. Kappelman, seemingly incredulous and further demonstrating her bias,

suggested that Ms. Reed had sent too many documents and that she should only have sent over a

single document.

242.     In reality, Ms. Reed had not even sent the majority of relevant documents to Ms.

Kappelman because, during their first meeting, Ms. Kappelman told Ms. Reed not to send a lot

of documents.

243.     Ms. Reed then met again with Ms. Kappelman on March 9, 2021.  During this

meeting, Ms. Kappelman, among other things: (i) directed Ms. Reed away from relevant topics;

(ii) was repeatedly intentionally obtuse with respect to what Ms. Reed was claiming – trying to

make it seem that Ms. Reed had concocted a wide-ranging conspiracy theory; (iii) engaged in

blatant victim blaming; (iv) claimed with certainty, but without basis, that some of Ms. Reed's

allegations were false; (v) suggested that it was somehow Ms. Reed's fault that Mr. McCauley

still had yet to deliver her performance review; and (vi) read selective excerpts from certain

documents and remarked, "this doesn't sound like a guy who's retaliating against you."

244.     At one point, Ms. Kappelman declared that there was no evidence to support Ms.

Reed's claims related to Ms. Prex and Ms. Flores.  However, when Ms. Reed asked Ms.

Kappelman if she had even spoken to Ms. Prex or Ms. Flores, Ms. Kappelman refused to answer the question, indicating that she had not even spoken with them.

245.    This was not, in any way, an "independent" investigation.

## V.    MS. REED RETAINS COUNSEL AND SUFFERS ADDITIONAL RETALIATION

246.    On March 10, 2021, Ms. Reed put the Company on notice that she had retained counsel and asserted claims of sexual harassment and retaliation.

247.    Just five days later, Ms. Reed discovered that several monitoring programs and additional users had been added to her computer on March 12, 2021, including, *inter alia*, "impersonate user" and "discovery initiatives."  A full copy of Ms. Reed's hard drive was removed from her system, domain peer use was set up, Ms. Reed's VPN user tokens were accessed, and desktop, hard drive, and cloud files were shared, read and/or written over. Moreover, various standing meetings were cancelled with no explanation and others were rescheduled to include Vice Presidents who would not ordinarily have attended the meetings.

248.    On March 15, 2021, Ms. Reed, through counsel, demanded that the Company cease and desist from further retaliatory conduct.

249.    The very next morning, Ms. Reed's work computer received not just one, but two "Patch" updates.  Unlike every other Patch update Ms. Reed has received, these two did not permit or allow for Ms. Reed to "postpone" the updates.  Following the updates, additional monitoring programs and users had been added to Ms. Reed's computer, including, *inter alia*, logging keystrokes, the ability to remotely turn on Ms. Reed's audio driver and the ability to see Ms. Reed's photos and audio.  The programs also indicated that a "shadow copy" of Ms. Reed's hard drive had been made.

250.    Another patch was added on March 19, 2021.

251.    This conduct is completely unethical and unacceptable, particularly given that Ms. Reed's cellular telephone is connected to her Microsoft API.

252.    Moreover, Ms. Reed's personal Gmail account, iCloud account and Apple ID, as well as her Microsoft 365 account and her photos, have all been accessed by foreign devices since she complained about Mr. McCauley's sexual advances.  Upon information and belief, the Company is directing these attacks into Ms. Reed's personal devices and accounts.

## VI.    **CONCLUSION**

253.    All of the foregoing conduct is continuing in nature, and the way that Ms. Reed has been treated is at odds with the way that Company has invested in other areas – areas led by individuals who were not sexually harassed by Mr. McCauley, and who were not forced to rebuff his sexual advances.

254.    By way of example only, Qualitrol has recently hired, for the first time, a Vice President of Procurement and a Senior Talent Recruiter, and is hiring additional individuals to the Inside Sales team.

255.     Mr. McCauley also made a request to Fortive to assign a "Fortive Ignite" person to provide support to Mr. Blanton in connection with the Customer Communications PD Initiative and Kaizen from which Ms. Reed was excluded.

256.    Meanwhile, Ms. Reed remains a team of one to support the marketing efforts for all product lines, globally, of a company that generates $200mm in revenue per year.

257.    By way of comparison, Anderson-Negele, another Fortive, Precision Technologies, Operating Company, does $75mm in revenue and has a VP of Marketing and then five people dedicated to marketing, in addition to four product managers and five field service specialists.

258.     Moreover, in recent weeks, following Ms. Reed's complaints, Qualitrol has updated the job descriptions for various open positions to include many of Ms. Reed's duties, indicating that the Company is looking to terminate and replace her.

259.     All the while, the Company still has not revealed the results of its alleged investigation into her complaints, which were first made more than a month ago.

260.     Instead, the Company continues to ignore Ms. Reed's pleas for help, including and April 8, 2021 outreach to Fortive's Board of Directors.  As such, on April 12, 2021, Ms. Reed was constructively discharged and submitted her resignation.

261.     Ms. Reed files this lawsuit, in part, to get the answers she deserves.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against Defendants Qualitrol and Fortive***

262.     Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

263.     By the actions described above, among others, Defendants Qualitrol and Fortive discriminated against Plaintiff by, *inter alia*, subjecting her to: (i) sexual harassment and *quid pro quo* sexual harassment; and (ii) disparate treatment because she refused to succumb to Mr. McCauley's sexual advances.

264.     As a direct and proximate result of the unlawful discriminatory conduct carried out by Defendants Qualitrol and Fortive in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

265.     As a direct and proximate result of the unlawful discriminatory conduct carried out by Defendants Qualitrol and Fortive in violation of Title VII, Plaintiff has suffered, and

continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

266.    Defendants Qualitrol and Fortive discriminated against Plaintiff discriminated with willful or wanton negligence, or recklessness, or with a conscious or reckless disregard of the rights of Plaintiff.  Accordingly, Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
***Against Defendants Qualitrol, Fortive, Cepheid, Phenomenex and Pall***

267.    Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

268.    By the actions described above, among others, Defendants Qualitrol, Fortive, Cepheid, Phenomenex and Pall retaliated against Plaintiff on the basis of her protected activities, including, but not limited to, her refusal to succumb to Ms. McCauley's sexual advances, as well as her internal and external complaints, in violation of the Title VII, by subjecting her to the various adverse actions and actions that would dissuade a reasonable worker from engaging in protected activity described herein.

269.    As a direct and proximate result of the unlawful retaliatory conduct carried out by Qualitrol, Fortive, Cepheid, Phenomenex and Pall in violation of the Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

270.    As a direct and proximate result of the unlawful retaliatory conduct carried out by Qualitrol, Fortive, Cepheid, Phenomenex and Pall in violation of the Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

271.    Defendants Qualitrol, Fortive, Cepheid, Phenomenex and Pall retaliated against Plaintiff discriminated with willful or wanton negligence, or recklessness, or with a conscious or reckless disregard of the rights of Plaintiff.  Accordingly, Plaintiff is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

272.    Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

273.    By the actions described above, among others, Defendants discriminated against Plaintiff by, *inter alia*, subjecting her to: (i) sexual harassment and *quid pro quo* sexual harassment; and (ii) disparate treatment because she refused to succumb to Mr. McCauley's sexual advances.

274.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

275.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

276.    Defendants discriminated against Plaintiff discriminated with willful or wanton negligence, or recklessness, or with a conscious or reckless disregard of the rights of Plaintiff. Accordingly, Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

277.     Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

278.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities, including, but not limited to, her refusal to succumb to Ms. McCauley's sexual advances, as well as her internal and external complaints, in violation of the NYSHRL, by subjecting her to the various adverse actions and actions that would dissuade a reasonable worker from engaging in protected activity described herein.

279.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

280.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

281.     Defendants retaliated against Plaintiff discriminated with willful or wanton negligence, or recklessness, or with a conscious or reckless disregard of the rights of Plaintiff. Accordingly, Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### *Against Defendant McCauley*

282.     Plaintiff hereby repeats, reiterates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

283.   By the actions described above, each and every Defendant unlawfully aided and abetted the unlawful discriminatory and retaliatory acts of each and every other Defendant.

284.   As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

285.   As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

286.   Defendants' aiding and abetting was carried out with willful or wanton negligence, or recklessness, or with a conscious or reckless disregard of the rights of Plaintiff. Accordingly, Plaintiff is entitled to an award of punitive damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York and the United States of America;

B.   An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.   An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.   An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.      An award of punitive damages, in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      An award of Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: April 12, 2021
       New York, New York                         Respectfully submitted,

                                                  **WIGDOR LLP**

                                                  By: _____
                                                      Michael J. Willemin

                                                  85 Fifth Avenue
                                                  New York, NY 10003
                                                  Telephone: (212) 257-6800
                                                  Facsimile: (212) 257-6845
                                                  mwillemin@wigdorlaw.com

                                                  *Counsel for Plaintiff*