UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

HAYLEY REED,

                                   Plaintiff,             DECISION and ORDER

-vs-                                             21-CV-6312 CJS

FORTIVE CORPORATION,
QUALITROL COMPANY LLC,
CEPHEID, PHENOMENEX,
INC., PALL CORPORATION,
ANDREW McCAULEY in his
Individual and professional
Capacities,

                                   Defendants.

_____

## INTRODUCTION

Hayley Reed ("Plaintiff") brings this action complaining of employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL").   Now before the Court are two motions (ECF Nos. 24 & 27) by Defendants to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).   For reasons discussed below, the Court finds that while Plaintiff maintains she was subjected to sexual discrimination and retaliation, the Amended Complaint does not plausibly plead such claims against any Defendant.   Accordingly, the applications are granted, and the action is dismissed.

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are taken from the Amended Complaint.   At all relevant times herein defendant Qualitrol Company LLC ("Qualitrol"), located in Fairport, New York, was one of eighteen "operating companies" owned by

defendant Fortive Corporation ("Fortive").[1]   Qualitrol and Fortive are separate companies having different principal places of business (Rochester, New York, and Everett, Washington, respectively), different corporate executives, and different boards of directors.

Nevertheless, Employee benefits for Qualitrol employees, such as insurances and retirement plans, were provided through Fortive.   Additionally, Fortive provided training for Qualitrol employees via Fortive's intranet site on topics such as leadership, sexual harassment prevention and data and security practices.   Fortive and Qualitrol also sometimes conducted joint projects such as trade shows.   Qualitrol employees were assigned Fortive email accounts and were sometimes given bonuses of Fortive stock.

Fortive was formerly "part of" Danaher Corporation ("Danaher"), though it "spun off" from Danaher in 2016, several years before the events at issue in this lawsuit.   In other words, at all relevant times Fortive and Danaher were entirely separate companies. Danaher owns various "operating companies" including defendants Phenomenex Company ("Phenomenex"), Cepheid ("Cepheid"), and Pall Corporation ("Pall").

At all relevant times herein, beginning in or about 2015, Plaintiff was employed by Qualitrol as the company's Digital Marketing and Marketing Communications Manager, with five employees reporting to her.   Prior to 2019, Plaintiff consistently received positive performance reviews and salary increases from Qualitrol.   Subsequently, including during the period covered by this lawsuit, Plaintiff continued to receive salary increases,

---

[1] Qualitrol's website indicates in pertinent part that "Qualitrol provides the world's energy grid with monitoring equipment to ensure reliable power."

though she claims that she was not given timely performance reviews.   In any event, the Amended Complaint does not allege that Plaintiff ever received a negative performance review from Qualitrol.

On August 21, 2019, defendant Andrew McCauley began his tenure as President of Qualitrol.   That same day, following a meeting at which McCauley was introduced to Qualitrol's staff, Plaintiff approached McCauley and offered him various marketing suggestions.   Plaintiff and McCauley continued to discuss marketing matters throughout the morning of that day, after which McCauley invited Plaintiff to lunch, ostensibly to continue their work-related discussion.   McCauley drove Plaintiff to a restaurant in his car, but stopped along the way, purportedly to inspect an apartment that was maintained by Qualitrol for use by the company president.   The apartment had been recently vacated by Qualitrol's former president, Linda Rae ("Rae"), and the Amended Complaint does not indicate whether it was furnished or empty.

Over Plaintiff's objections, McCauley insisted that Plaintiff accompany him inside because he "wanted her opinion" about the apartment.   Once inside, Plaintiff remained near the entrance while McCauley inspected the apartment.   Plaintiff maintains that at some point, McCauley called to her multiple times, asking her to join him in the bedroom, though not for any stated purpose.[2]   Plaintiff did not go into the bedroom but, instead, exited the apartment.   In that regard, Plaintiff maintains that when McCauley asked her to come into the apartment bedroom, he was making a sexual advance.   McCauley and

---

[2] The Amended Complaint contends, at paragraphs 84-86, that McCauley made five specific requests to Plaintiff to join him in the bedroom of the apartment.   However, paragraph 231 of the pleading indicates that Plaintiff previously told Fortive that McCauley made such request only "twice."

Plaintiff then proceeded to a restaurant for lunch, during which Plaintiff claims McCauley made further "inappropriate sexual advances" toward her.   Specifically, McCauley asked Plaintiff "if she was married or had a boyfriend."   The pleading does not indicate that McCauley said anything overtly sexual at the apartment or the restaurant.   Plaintiff, however, contends that she "ma[d]e clear that she would not submit to Mr. McCauley's sexual advances," though she does not indicate exactly what, if anything, she said to him, either at the apartment or the restaurant.

Plaintiff did not make any contemporaneous complaint to Qualitrol about McCauley's alleged behavior, purportedly because she felt that the company had not properly handled two prior incidents in which she had been involved.[3]   Plaintiff alleges, though, that she "confided in" a "peer," Qualitrol's Director of Product Marketing, Stacy Downs ("Downs"),[4] and decided "that the best course of action would be to simply put her head down and work as hard as possible to shift Mr. McCauley's focus away from his sexual interest and [toward] her work product."[5]

---

[3] In the first incident, in 2016, Plaintiff complained to a Qualitrol male vice president about a colleague who was "violating email marketing compliance rules."   Plaintiff subsequently cut off that same colleague's "access to certain content," after which a different Qualitrol vice president became "enraged" by Plaintiff's action and called her a "bitch" and a "princess."   Plaintiff contends that when she complained about this to Human Resources ("HR"), news of the event "spread like wildfire" within the company and certain non-HR executives advised Plaintiff that she had been unwise to make the complaint.   In the second incident, in 2017, Qualitrol's Vice President of Operations became angry at Plaintiff after she scheduled an in-office baby shower for a colleague.   During an ensuing argument, Plaintiff told the Vice President, "[I]t's just a fucking baby shower, Dick."   Plaintiff later apologized for her remark after a different Vice President told her that she should apologize to avoid the offended executive from making Plaintiff's life "a living hell."

[4] The Amended Complaint refers to Downs as Plaintiff's "peer," and indicates that Downs led a "team of Product Managers." (Amended Complaint at ¶ ¶ 160, 186).

[5] *See*, Amended Complaint at ¶ 90 ("Immediately upon her return to the office, Ms. Reed confided in Stacy Downs.").   The Amended Complaint does not indicate what Plaintiff allegedly told Downs, and, in particular, does not indicate that Plaintiff told Downs she had been sexually harassed by McCauley.

The Amended Complaint does not allege that McCauley threatened Plaintiff or expressed any anger or annoyance with her, at any relevant time, including the day she allegedly declined his sexual advances, or at any time thereafter.   Indeed, the pleading does not indicate that McCauley even acknowledged Plaintiff's decision not to enter the apartment bedroom or her self-described refusal of his alleged advances at the restaurant.   The pleading also does not allege that McCauley ever subsequently referred to the events of that day or made any other comments that Plaintiff perceived as sexual advances.   The pleading does not identify any off-color comment ever having been made by McCauley, to anyone.   Nor does Plaintiff allege that McCauley ever expressly or impliedly connected any company decision concerning her working conditions to her refusal of his alleged sexual advances on August 21, 2019.

Nevertheless, Plaintiff contends that as a result of her refusal to accede to McCauley's alleged advances on that one occasion, McCauley later subjected her, over the course of almost two years, to "blatant retaliation" consisting of disparate treatment and various adverse employment actions.[6]   As proof of this, the Amended Complaint lists the following incidents.

In October 2019, McCauley refused to fill a vacant position in Qualitrol's marketing department.   Plaintiff alleges, in that regard, that prior to McCauley's arrival at Qualitrol, there had been a vacancy for a "Digital Marketing Specialist," for which there was money earmarked in the budget, and for which Plaintiff's direct supervisor, the Vice President of

---

[6] As succinctly summarized in one of the motions to dismiss, "Reed . . . claims that McCauley   . . . retaliated against her by taking away direct reports, decreasing her budget, shutting her out of strategic planning, increasing her workload, and finally, effectively eliminating her role." (ECF No. 27-1 at p. 6).

Marketing, Gary Anderson ("Anderson"), had been interviewing candidates.    Plaintiff
maintains that upon McCauley's arrival at Qualitrol, he changed direction in that regard,
first telling Plaintiff that the company could hire a "Marketing Specialist" but not a "Digital
Marketing Specialist," and later telling her that the position could not be filled at all,
purportedly due to budget constraints.    Plaintiff asserts, though, that such reason was
"untrue because the role was already accounted for in the budget."

Apparently around this same time, during the Fall of 2019, McCauley fired
Anderson, Plaintiff's immediate supervisor, for unspecified reasons.    Plaintiff alleges that
McCauley subsequently made an "outrageous" comment to her about Anderson, namely,
that, "Gary didn't do you any services.    He doesn't' have the same feelings about divorce
that I do."    Plaintiff maintains that "[t]his was a completely inappropriate reference to the
fact that Mr. Anderson was very religious, and [that Plaintiff] was going through a divorce
at the time."

Plaintiff alleges that McCauley's actions in this regard, in refusing to fill the position
and in terminating Anderson, were detrimental to her.    In particular, Plaintiff asserts that
the decision not to hire a replacement Marketing Specialist deprived her of a staff
member, and that the termination of Anderson resulted in her reporting directly to
McCauley.

Plaintiff further contends that she was subsequently excluded from "[a]ll strategic
planning conversations and sales marketing meetings."    In that regard, Plaintiff alleges
that prior to McCauley's arrival at Qualitrol she had attended all sales meetings and had
been a leader in preparing marketing strategic plans for submission to the CEO at

Qualitrol's parent company, Fortive.   Plaintiff alleges, however, that in the Fall of 2019 she "was excluded" from those roles, though she does not say by whom.   The Amended Complaint does not allege what role, if any, McCauley personally played in those decisions, or what explanations, if any, Plaintiff was given by anyone else at Qualitrol for the changes.

Plaintiff alleges that McCauley subsequently "slashed" the marketing team's budget for 2020.   In this regard, Plaintiff alleges that since she was short one member of her marketing team due to McCauley's decision not to hire a Digital Marketing Manager, it was "critical heading into 2020" that her team have an "adequate budget."   The Amended Complaint asserts, however, that the marketing team's budget was cut by nearly a million dollars, "overall and in specific critical areas," including the amount allocated for trade shows.   The pleading alleges that other Qualitrol teams also had their budgets cut, "but not anywhere near as significant[ly]" as Plaintiff's team's budget.

Plaintiff next alleges that in February 2020, she was assigned an unreasonably difficult task with insufficient time to prepare.   In that regard, Plaintiff alleges that Qualitrol annually selected an employee to prepare a policy-deployment initiative ("PD Initiative") in connection with Fortive's overall strategic plan for the year for its operating companies. Plaintiff indicates that she had successfully led such PD Initiatives in 2017 and 2018, and that she was again selected to do so for 2020.   However, Plaintiff alleges that while such an assignment was "generally considered to be an honor," this time it was not, for two reasons: First, she was given only a week to prepare for the project; and, second, the project's objective was "completely unreasonable."   The pleading asserts, in that regard,

that Plaintiff was "tasked with increasing non-flow revenue an absurd 125%," when prior "revenue increase goals" had "generally" been "in the neighborhood of 18%." The pleading does not indicate what role, if any, McCauley had in assigning Plaintiff to lead the PD Initiative.

Related to Qualitrol's desire to increase revenue, the pleading indicates that McCauley "assigned" a performance goal to the "inside sales team," which reported to Plaintiff, to "increase incremental revenue a whopping 333%."

Plaintiff alleges that these assignments (the PD initiative and the sales performance goal) required her to work "15+ hour days" during the first three quarters of 2020. Plaintiff maintains, however, that McCauley displayed little regard for how hard she was working, and that he "intentionally made her life more difficult" by directing her to perform additional tasks for which she did not feel she had adequate staff. Plaintiff further indicates that in June 2020, McCauley "forced" her to lead a marketing event after she had asked him not to do so. Plaintiff also alleges that McCauley showed "little concern" for her efforts relating to the PD initiative, since he "stopped the monthly update meetings" concerning the project and admitted that he did not view the project as a "priority."

The Amended Complaint next alleges that McCauley failed to "support" Plaintiff when she identified a problem at Qualitrol concerning the Inside Sales Team, which reported to Plaintiff. Specifically, McCauley "provided no support" to Plaintiff after she "identified falsification of incremental revenues." In this regard, Plaintiff alleges that, apparently in mid- to late-2020, she "learned both that [Qualitrol's] Inside Sales Team was

way behind with respect to [its] goals and that [it was] falsifying incremental revenue."
The pleading indicates that Plaintiff attempted to "remedy the problem by providing
coaching" to Matt Munson ("Munson"), the Inside Sales Manager, but that Munson was
"not receptive" to her suggestions and "attempted to circumvent [Plaintiff's] authority" by
contacting her direct supervisor instead of speaking to her.[7]    The pleading asserts that
Plaintiff then contacted Kevin Blanton ("Blanton"), Qualitrol's Sales Director of the
Americas, about the alleged falsification of incremental revenues.    However, Blanton told
Plaintiff that he already knew about the problem and had discussed it with McCauley, who
had declined to address the problem.

　　　　Plaintiff subsequently had "a series of meetings with HR about the [falsification of
revenues] problem," and, on October 9, 2020, gave a written proposal to McCauley, and
to Thomas Hodge ("Hodge"), Qualitrol's Vice President of Human Resources, about
"restructuring the Inside Sales Team."    The Amended Complaint indicates that McCauley
promised to "think over" Plaintiff's proposal but that he apparently never did so.    The
pleading indicates, rather, that in November 2020, McCauley informed Plaintiff that he
had decided to terminate Munson and remove the Inside Sales Team from under
Plaintiff's supervision and place it instead under the supervision of Blanton.    Plaintiff
indicates that McCauley told her that he expected she would view those developments
as "good news."    Plaintiff, though, contends that she did not view them as such, since
the result was that "she was being stripped of additional direct reports and resources."

_____

[7]  Plaintiff here is apparently indicating that Munson spoke to McCauley, since Plaintiff previously
indicated that the termination of Anderson's employment resulted in her reporting directly to McCauley.

During that same discussion concerning Munson, McCauley informed Plaintiff that he was also terminating Alan Gray ("Gray"), "a U.K.-based graphic designer" who was one of Plaintiff's "direct reports."   Plaintiff argued strenuously against such a move since she viewed Gray as a "critical member" of her marketing team.   However, McCauley insisted that Gray be terminated in order to "free up money to hire a digital marketing person."   Plaintiff maintains that such explanation made no sense to her, since a digital marketing employee would have been paid significantly more than what Gray was earning.   Nevertheless, Gray was terminated.   The pleading alleges that McCauley subsequently never hired a "digital marketing person," but, instead, hired a "Technical Content Writer" who reported to someone other than Plaintiff.

Plaintiff next alleges that she was "excluded" from certain workshops and conferences.   More specifically, in October 2020, after Plaintiff received an evaluation from McCauley about her PD Initiative, she contacted Qualitrol's Director of Operations, Lori Tamarez ("Tamarez"), about "concerns" that she had with McCauley's evaluation. In particular, Plaintiff felt that McCauley had "downplayed" Plaintiff's achievements and instead given credit to the Sales Team generally for her individual work.   In any event, during her discussion with Tamarez, Plaintiff learned about an upcoming Policy Deployment Training Workshop event, to which she had not been invited.   The pleading does not indicate who was responsible for making such invitations.   Plaintiff maintains that, subsequently, McCauley made a presentation at that workshop relating to Plaintiff's work that "made [Plaintiff] look terrible and expendable," though the pleading does not explain that assertion.

Plaintiff alleges that she also subsequently learned about a "Growth Conference" being put on by Fortive, to which she had not been invited. The pleading asserts that it was "weird" that McCauley had not nominated Plaintiff to attend the Fortive event, since "the entire conference was about Marketing."

Plaintiff next maintains that McCauley failed to provide her with performance reviews.  More specifically, the Amended Complaint asserts that Plaintiff was "given virtually no performance feedback during 2020," even though it was a regular practice at Qualitrol for managers to hold quarterly feedback meetings with employees, in addition to mid-year and annual reviews.  Plaintiff alleges, however, that McCauley was "so disinterested in [her]" that he failed to provide her with the customary performance reviews and did not give her a performance review for 2020 until in or about February 2021.  However, while the pleading refers to Qualitrol's past customary practices concerning performance reviews prior to McCauley becoming President, it does not indicate when other Qualitrol employees actually received their 2020 annual reviews in relation to when Plaintiff received hers.

Plaintiff further alleges that in January 2021 she learned that she was being "excluded" from meetings to which she felt she should have been invited.   Specifically, Plaintiff alleges that during a discussion with Anis Zribi ("Zribi"), Qualitrol's Vice President of Research and Development, she learned that the company was holding "monthly Innovation Forum calls" to which she was not invited.   Plaintiff complained about this and, over the objection of Ms. Downs, was eventually permitted to participate in the calls, though Ms. Downs instructed Plaintiff that she was not permitted to speak during the calls.

Plaintiff next alleges that she was "stripped of resources" and denied "ownership of the marketing budget."   In this regard, the pleading indicates that, apparently in early 2021, Tamarez sent an email indicating that an event relating to Qualitrol's 2021 PD Initiative "would be occurring even earlier in the year than normal." Plaintiff alleges, though, that she had not been given access to information about the 2021 strategic plan to which the PD Initiative would apply, even though she had been involved in past PD Initiatives, as discussed earlier.   Plaintiff further alleges that she was not provided with a copy of the marketing budget, even though in past years she had "ownership of the marketing budget."   Plaintiff alleges that she needed access to the budget to plan for 2021, but that Qualitrol's Finance Team would not provide it to her.   Apparently in response to Plaintiff's complaints about such lack of access to the budget, she was permitted to attend a meeting of Qualitrol executives, including McCauley, Ms. Downs, and the company's Finance Manager and Vice President of Finance.   Plaintiff contends that at the meeting she was shown a copy of the budget, but that this gesture was "completely unhelpful," since it did not give her sufficient information "to determine which purchase orders she could submit and approve."   The pleading contends that Plaintiff later learned that a decision had been made in the summer of 2020 to "strip her of ownership over the budget," though it does not specify why or by whom that decision was made.

Plaintiff further alleges that she learned, in early 2021, that her overall role at Qualitrol had been "virtually eliminated."   In that regard, the Amended Complaint asserts that in early 2021, Plaintiff discovered that during the summer of 2020 Qualitrol had

adopted a new marketing process, which introduced "various product launches and marketing plans, about which [Plaintiff] was never informed or consulted." Plaintiff further learned that the Sales Team had begun "doing its own marketing," thereby "completely cutting her out of the process." Plaintiff also discovered that she had not been included on a team as part of Qualitrol's online "virtual whiteboard," and that Ms. Downs had taken over certain "value proposition work previously performed by [Plaintiff]." The pleading contends that this last development was a "major blow" to Plaintiff, since the work taken over by Downs was "highly visible work [that] was performed alongside Fortive." Plaintiff also learned that McCauley had been holding monthly "Marketing Key Performance Indicator Meetings" to which she had not been invited, but to which "Ms. Downs and her team of Product Managers" had been invited.

In December 2020, Plaintiff began looking for other employment "within the Fortive network of companies." In particular, the Amended Complaint indicates that Plaintiff applied to two "Fortive companies," Industrial Scientific and Tektronix, but was not hired by either. The pleading indicates that Plaintiff first spoke with Julie Prex ("Prex"), the Vice President of Marketing at Industrial Scientific, who indicated that she would "love" to hire Plaintiff, but then never followed up. Plaintiff next spoke with Kristi Flores ("Flores") at Tektronix, who indicated that Plaintiff would "be great" for an open position there, but who then also failed to follow up with Plaintiff.

Plaintiff then decided to apply to companies owned by Danaher, which, as noted earlier, had previously (prior to 2016) been affiliated with Fortive but which was then an entirely separate company. The pleading alleges that in early December 2020, Plaintiff

began communicating with Danaher's corporate recruiter, Necole Short ("Short"), who suggested that Plaintiff apply for positions at defendants Cepheid and Phenomenex.   In particular, Short told Plaintiff about a position at Cepheid that had been "open for months," "that required someone with Gas Chromatography experience, which [Plaintiff] actually had."[8]   The pleading indicates that Short also suggested that Plaintiff apply for a position at Phenomenex, but the details concerning that position are not explained in the pleading. Plaintiff indicates that she immediately sent job applications to Danaher for those positions, but that, "[a]ll of a sudden, Phenomenex and Cepheid went dark and ceased responding to [Plaintiff's] emails."[9]

The Amended Complaint also indicates that on January 26, 2021, Plaintiff was "contacted by a recruiter" for defendant Pall Corporation, another one of Danaher's "operating companies," about a job opening.   Plaintiff applied for the position at Pall.

On February 8, 2021, Plaintiff lodged a complaint with Fortive concerning McCauley's alleged sexual advances on August 21, 2019, and his alleged mistreatment of her thereafter.   That is, Plaintiff went outside of Qualitrol and filed a complaint with Qualitrol's parent company, Fortive.   More specifically, that day Plaintiff met with Tony Stohlmeyer ("Stohlmeyer"), Fortive's Vice President of Human Resources, and stated that she "had been sexually harassed by Mr. McCauley and retaliated against for refusing his

---

[8]  The particular requirements of the job, as well as the nature and extent of Plaintiff's "experience with Gas chromatography," are unclear from the pleading.

[9]  Although the Amended Complaint asserts that Cepheid and Phenomenex "ceased responding" to Plaintiff's emails, the pleading actually does not indicate that Plaintiff ever had any direct exchanges with either of those companies, apart from her initial discussion with Ms. Short, who worked for those company's parent company, Danaher.

advances."   Stohlmeyer put Plaintiff in contact with Fortive's General Counsel, Douglas

Hicks ("Hicks").[10]   On February 12, 2021, Plaintiff spoke with Hicks by telephone.   The

Amended Complaint implies, however, that Hicks did not take Plaintiff's complaint

seriously, since he devoted only fifteen minutes to that initial conversation, which was not

sufficient for Plaintiff to explain "the entire series of events."   Hicks apparently ended the

conversation by directing Plaintiff to send him an email "summarizing her complaints."

Plaintiff, meanwhile, "had three successful interviews" concerning the position at

Pall for which she had applied.   In particular, Plaintiff indicates that on February 10, 2021,

she had an interview with Rosalind Biencourt, "a Digital Marketing Manager" at Pall, who

"informed [Plaintiff] that [Plaintiff] would be reporting to her [if hired] and [that] she was 'so

excited' for [Plaintiff] to start."   The pleading, though, does not indicate that Biencourt or

anyone else at Pall ever actually offered Plaintiff a position.   Rather, Pall apparently told

Plaintiff only that she "would receive a response" by February 12, 2021, which was later

extended to February 19, 2021.

In the meantime, Plaintiff alleges that Qualitrol continued to retaliate against her.

Specifically, the Amended Complaint indicates that on February 22-24, 2021, a

"beginning-of-the-year kickoff sales meeting" was held by Qualitrol, at which Plaintiff had

originally been scheduled to make a 30-minute presentation at the end of the first day of

the event.   However, for reasons unspecified in the pleading, Plaintiff's presentation was

rescheduled to the end of the third day of the event without anyone first consulting her.

---

[10]  Fortive and Qualitrol deny that Hicks was Fortive's General Counsel, but for purposes of this Decision
and Order the Court accepts Plaintiff's assertion.

The pleading asserts that Plaintiff's talk was then poorly attended, and that her presentation time was further cut to fifteen minutes.   Plaintiff further asserts that she "was not invited to a single one of the various 'breakout' meetings during the conference, even though she had specifically explained that she had a new prospecting tool, about which she needed to train the sales team."

On February 25, 2021, Plaintiff sent Hicks an email summarizing her sexual harassment complaints, as Hicks had requested.[11]   Plaintiff asserted to that she had "endured 18 months of retaliation" which she described, consisting of the same matters set forth herein earlier.

On March 1, 2021, Fortive hired attorney "Lynn A. Kappelman [("Kappelman")], a partner at Seyfarth Shaw, LLP," to investigate Plaintiff's allegations.   The Amended Complaint asserts that Plaintiff was "taken aback" by the selection of Kappelman, since according to Plaintiff's research, Kappelman "had spent her entire career defending companies against discrimination and harassment complaints."   The pleading further contends that Plaintiff felt Kappelman was biased against her, since during their discussions, the first of which apparently took place on March 2, 2021, "Kappelman's tone and line of questioning made clear that her goal was to undermine [Plaintiff] and her claims, not to independently investigate them."   As evidence of this, the pleading asserts that Kappelman "raised her voice," "repeatedly suggested that Mr. McCauley's conduct [on August 21, 2019] would somehow have been appropriate had [Plaintiff] not stated to

---

[11] Plaintiff's email to Hicks on that date noted that she had already had an interview with Stohlmeyer and two interviews with Hicks about the matter.

him explicitly that she was uncomfortable," and suggested that Plaintiff should not have assumed McCauley had "malintent" when he asked Plaintiff to come into the apartment bedroom.

Meanwhile, regarding the position at Pall for which Plaintiff had applied, on March 2, 2021, "an HR representative at Danaher," Sally Brynes ("Brynes"), told Plaintiff "that she should receive feedback on the open position the next day."[12]   The following day, March 3, 2021, Brynes told Plaintiff that she did not receive the position at Pall for which she had been interviewing, "but that a senior leadership role was opening at Pall Corporation, and that the company would redefine the role specifically for [Plaintiff]."

On March 4, 2021, Plaintiff, whom the Amended Complaint indicates was "shaken by the way she was treated by Mr. Hicks and Ms. Kappelman," "reached back out to Mr. Stohlmeyer," to ask if she could speak to someone in Fortive's Human Resources department, rather than its Legal department.   Stohlmeyer responded that Plaintiff could speak with Human Resources, but that any communications concerning her sexual harassment complaint would still have to be directed through Hicks and Kappelman. Plaintiff responded by sending a letter to Stohlmeyer indicating that she was not comfortable with that arrangement, to which Stohlmeyer did not respond.

On March 5, 2021, Plaintiff, purportedly "determined to right the foregoing wrongs," sent "documentation" to Kappelman concerning her complaints.   According to the Amended Complaint, however, Kappelman commented that Plaintiff had "sent too many

---

[12]The pleading suggests that the timing of Bryne's communication is significant, since it occurred forty minutes after Plaintiff had her first interview with Ms. Kappelman.

documents," which further revealed Kappelman's "bias."

Also on March 5, 2021, someone at Danaher, apparently Brynes, reportedly told Plaintiff "that she would be receiving additional information concerning th[e] new [senior leadership] role [which Brynes had mentioned] 'shortly.'" However, Pall never subsequently communicated further with Plaintiff.

On March 9, 2021, Plaintiff again met with Kappelman.  The pleading asserts, however, that Kappelman continued to act in a biased manner toward Plaintiff, since she "directed [Plaintiff] away from relevant topics," "was repeatedly intentionally obtuse" about Plaintiff's claims, "engaged in victim blaming," claimed that some of Plaintiff's claims were "false," stated that there was "no evidence" to support some of Plaintiff's other claims, used selective quotes to attempt to convince Plaintiff that McCauley had not retaliated against her, and "suggested that it was somehow Plaintiff's fault that Mr. McCauley still had yet to deliver [Plaintiff's] performance review."

On March 10, 2021, Plaintiff notified Fortive that she had retained her own attorney.

On March 11, 2021, Plaintiff received an email from Cepheid, purportedly "saying that the company [had] decided to move forward with other candidate *or* cancelled the position."[13]   The pleading suggests that the job at Cepheid was not actually filled, however, since Plaintiff "saw the job position at Cepheid was still listed as available on [the employment website] LinkedIn on March 11, 2021."

---

[13] Emphasis added.   It is unclear whether Plaintiff is purporting to paraphrase from memory or to directly quote the email that she received, though it appears to be the former and not the latter.

The pleading indicates that the timing of the "rejection letter" from Cepheid is significant to Plaintiff's claim, since March 11, 2021, was the day after Plaintiff "put Fortive and Qualitrol on notice that she had retained counsel in regard to her claims."[14]   In that regard, the pleading seemingly asserts that persons at Fortive and Qualitrol were not only aware that Plaintif had applied for the position at Cepheid, but that those same persons also immediately received the notice that Plaintiff had retained an attorney, after which they contacted Cepheid to procure the denial of Plaintiff's job application.

As evidence of such communication between Fortive/Qualitrol and Danaher/Cepheid, the Amended Complaint alleges, "[u]pon information and belief, [that] Mr. McCauley had a close personal relationship with the President of *Phenomenex*, Damaris Mills" ("Mills") (emphasis added).   In that regard, again, Phenomenex and Cepheid are separate companies, though they both have Danaher as a parent company. In any event, Plaintiff thus maintains that McCauley must have learned that she had retained an attorney, and then contacted Mills at Phenomenex, who then contacted someone at Cepheid.

The Amended Complaint similarly seems to assert that McCauley must have been responsible for the denial of the first position at Pall for which Plaintiff had applied.   More specifically, the pleading states that Plaintiff "was well on her way to [receiving a job] offer [from Pall] . . . until Victor A. Maurtua [("Maurtua")], Pall Company's Vice President of

---

[14]  The pleading actually asserts that the two events occurred on the same day, but the pleading more specifically indicates that on March 10, 2021, Plaintiff gave notice that she had retained an attorney (¶ 260), and that on March 11, 2021, she received the notification from Cepheid (¶ 199).

Strategy and Business Development, contacted Mr. McCauley."[15]    The Amended
Complaint offers no facts that such a communication actually occurred.   However, the
pleading asserts that such a conversation *must have* occurred, since, at some unspecified
time, McCauley's predecessor as President of Qualitrol, Ms. Rae, "informed [Plaintiff] this
was a customary part of the hiring process."   In that regard, the pleading states:

> [Plaintiff] was aware of the communication between Mr. Maurtua and Mr.
> McCauley because Ms. Rae informed [Plaintiff] this was a customary part
> of the hiring process.   As the relationship between Donahue [sic,
> presumably referring to Danaher] companies and Fortive companies was
> very close, Ms. Rae told [Plaintiff] that it was customary for hiring managers
> at the other related companies to contact Mr. McCauley to ensure any job
> switches were permissible on his end.

Amended Complaint at ¶ 205.

Regarding the second position at Pall for which Plaintiff had been considered, the
Amended Complaint asserts that Plaintiff was turned down for the position because of
her complaint against McCauley.   As evidence of McCauley's retaliatory influence, the
pleading states the following:

> Unsurprisingly, Mr. McCauley had a close personal relationship with
> Francois Manderville, a Senior Vice President at Pall Corporation.   Mr.
> McCauley is also socially connected[16] to Christopher Riley, a Vice
> President at Danaher Operating Companies, and Darin Latimer, a Vice
> President of Strategic Innovation at Danaher.

Amended Complaint at ¶ ¶ 211-212.

On or about March 15, 2021, Plaintiff noticed what she considers to have been

---

[15]  The assertion that Plaintiff "was well on her way to receiving a job offer" is entirely speculative and
conclusory, and need not be accepted as true.

[16] The pleading offers no explanation of what is meant by "socially connected."

retaliatory tampering with her work computer.   The pleading indicates, for example, that Plaintiff "discovered that several monitoring programs and additional users had been added to her computer," including "impersonate user" and "discovery initiatives." Additionally, the pleading asserts that "[a] full copy of [Plaintiff's] hard drive was removed from her system, domain peer sue was set up, [Plaintiff's] VPN user tokens were accessed, and desktop, hard drive and cloud files were shared, read and/or written over." The pleading also indicates that Plaintiff noticed two "patch updates" on her computer that seemed suspicious, since they did not give Plaintiff the opportunity to "postpone" them.   The pleading asserts that such actions were "completely unethical and unacceptable," since Plaintiff's "cellular telephone [was] connected to her Microsoft API," and since her "personal Gmail account, iCloud account[,] Apple ID[,] Microsoft 365 account[, and] photos" were all "accessed by foreign devices [after] she complained about Mr. McCauley's sexual advances.   The pleading alleges, "upon information and belief," that Fortive and/or Qualitrol "direct[ed] th[o]se attacks into [Plaintiff's] personal devices and accounts."

On April 12, 2021, Plaintiff ceased working at Qualitrol, purportedly because she felt she had been "constructively discharged" by the events described above.   That very same day, Plaintiff commenced this action, purporting to assert claims under both Title VII and the NYSHRL.   More specifically, the Complaint purported to assert the following five claims: 1) "Discrimination" against Qualitrol and Fortive in violation of Title VII, in which those defendants subjected Plaintiff to "sexual harassment and *quid pro quo* sexual harassment" and "disparate treatment because she refused to succumb to Mr.

McCauley's sexual advances"; [17] 2) "retaliation" against Qualitrol, Fortive, Cepheid, Phenomenex, and Pall, in which those defendants "retaliated against Plaintiff on the basis of her protected activities, including but not limited to, her refusal to succumb to Mr. McCauley's sexual advances, as well as her internal and external complaints"; 3) "discrimination" against all defendants in violation of NYSHRL, in which defendants subjected Plaintiff to "sexual harassment and *quid pro quo* sexual harassment" and "disparate treatment because she refused to succumb to Mr. McCauley's sexual advances"; 4) "retaliation" against all defendants in violation of NYSHRL, in which those defendants "retaliated against Plaintiff on the basis of her protected activities, including, but not limited to, her refusal to succumb to Ms. McCauley's sexual advances, as well as her internal and external complaints"; and 5) "aiding and abetting" discrimination against McCauley, in violation of NYSHRL, in which McCauley "aided and abetted the unlawful discriminatory and retaliatory acts of each and every other Defendant."

On June 21, 2021, Fortive, Qualitrol and McCauley ("the Fortive Movants") filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.   On June 25, 2021, Cepheid, Phenomenex, and Pall ("the Danaher Movants"), filed a motion for the same relief.

On July 30, 2021, Plaintiff filed the Amended Complaint, mooting Defendants' motions to dismiss the original Complaint.   The Amended Complaint purports to assert the same five claims as the original Complaint, supplemented with additional allegations.

---

[17]  The First and Second Causes of Action appear to be mislabeled, as the headings indicate that they are asserting claims under the NYSHRL, but the supporting allegations thereunder refer to violations of Title VII.

On August 20, 2021, Defendants filed the two subject motions to dismiss the Amended Complaint pursuant to Rule 12(b)(6), asserting essentially the same grounds for dismissal as before.

The first such motion, by Fortive Movants, asserts the following arguments: That Fortive was not Plaintiff's employer for purposes of Title VII or the NYSHRL; that the alleged sexual advance by McCauley on August 21, 2019, is time-barred under Title VII's 300-day filing rule; that the Amended Complaint fails to state claims for *quid pro quo*, hostile environment, disparate treatment, retaliation, or constructive discharge under either Title VII or NYSHRL; and that the pleading also fails to plead a plausible aiding-and-abetting claim against McCauley.

The second motion to dismiss, by Danaher Movants, generally contends that Plaintiff has not pleaded a plausible retaliation claim against them for failing to hire her. In that regard, the motion asserts that the Amended Complaint fails to plausibly allege retaliation since, for example, it does not plausibly allege either that those defendants had notice that Plaintiff had engaged in protected activity, or that their decisions not to hire her were in any way connected to such protected activity.

Plaintiff maintains that the motions to dismiss should be denied in all respects, for reasons that will be discussed further below.

The Court has thoroughly considered the parties' submissions.

DISCUSSION

<u>12(b)(6) Motion</u>

Defendants have filed motions to dismiss the Amended Complaint pursuant to

Rule 12(b)(6), and the legal standards applicable to such applications are clear:

> To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

*Progressive Credit Union v. City of New York*, 889 F.3d 40, 48 (2d Cir. May 1, 2018).

> In its review, the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents "integral" to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. Jun. 3, 2014) (citations and internal quotation marks omitted).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

> First, although a court must accept as true all of the allegations contained in a complaint, [18] that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.   Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted).   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009) (citation omitted).

"[A]s *Iqbal* makes clear, a plausible claim must come before discovery, not the other way around." *Angiulo v. Cty. of Westchester*, No. 11-CV-7823 CS, 2012 WL 5278523, at *3 (S.D.N.Y. Oct. 25, 2012) (citation omitted); *see also, McBeth v. Porges*, 171 F. Supp.3d 216, 236 (S.D.N.Y. 2016) (Observing that pursuant to *Iqbal's* pleading standard, "the Federal Rules of Civil Procedure do 'not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions or speculation.'") (quoting *Iqbal*).

<u>Plaintiff Cannot Amend Her Pleading by Asserting New Facts and
Legal Theories in Her Response</u>

---

[18]The Court must accept the plausible factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), cert. den. 531 U.S. 1052, 121 S.Ct. 657 (2000).

Plaintiff opposes Defendants' motions to dismiss and has not requested leave to further amend her pleading.  However, as discussed further below, in at least one significant instance Plaintiff's responsive papers attempt to assert a new fact that is a not contained in the Amended Complaint.  This is impermissible in response to a Rule 12(b)(6) motion. *See, e.g., Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 753 (S.D.N.Y. 2016) ("The plaintiff cannot amend his complaint merely by raising new facts and theories in his opposition papers.") (citations and internal quotation marks omitted), *aff'd*, 712 F. App'x 57 (2d Cir. 2017).    Accordingly, to the extent that Plaintiff's opposition papers assert facts not contained in the Amended Complaint, the Court does not consider them.

<u>Title VII & NYSHRL Claims in General</u>

Plaintiff is asserting claims for sex-based discrimination under both Title VII and NYSHRL.   When considering claims of sex discrimination under these two statutes, the analysis is generally identical, though with some differences which will be discussed later.[19] *See, Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n. 9 (2d Cir. 2008) ("We typically treat Title VII and NYSHRL discrimination claims as analytically identical, applying the same standard of proof to both claims."), as amended (Apr. 22, 2008).

---

[19]  *See, e.g., Williams v. New York City Hous. Auth.*, No. 18CV5912JGKRWL, 2021 WL 1109842, at *20 (S.D.N.Y. Mar. 23, 2021) ("'Prior to amendments made to the NYSHRL that took effect on October 11, 2019, NYSHRL hostile environment claims were analyzed in essentially the same manner as hostile work environment claims under Title VII[.] . . .   For hostile work environment claims that occurred after the 2019 amendment's effective date, the standard has changed "to eliminate the requirement that harassing or discriminatory conduct be 'severe or pervasive' for it to be actionable and to adopt instead a more protective standard that prohibits conduct that results in 'inferior terms, conditions or privileges of employment.' *Maiurano v. Cantor Fitzgerald Sec.*, No. 19-cv-10042, 2021 WL 76410, at *3 & n.2 (S.D.N.Y. Jan. 8, 2021) (quoting N.Y. Exec. Law § 296(1)(h)).").

Under Title VII, it is unlawful for employers to, among other things, "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).   . . .   Claims brought pursuant to Title VII are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Littlejohn* [*v. City of New York*], 795 F.3d [297,] 312 [(2d Cir. 2015)]. In particular, "absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff [1] is a member of a protected class, [2] was qualified, [3] suffered an adverse employment action, and [4] has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Id*. at 311.

*Bockus v. Maple Pro, Inc.*, 850 F. App'x 48, 50 (2d Cir. 2021).

<u>Whether Fortive Was Plaintiff's Employer</u>

Plaintiff maintains that Fortive and Qualitrol constitute a single employer for purposes of Title VII and NYSHRL, while Fortive Movants contends that the Amended Complaint fails to plausibly allege that Fortive was Plaintiff's employer.   However, the Court need not resolve this question,[20] since it finds below that the Amended Complaint

---

[20]  *See, generally, McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 81 (S.D.N.Y. 2020) ("The Second Circuit has adopted a widely used four-part test to determine whether a parent and subsidiary constitute a single employer. It examines evidence of '(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook* [*v. Arrowsmith Shelburne, Inc.*], 69 F.3d [1235,] 1240 [(2d Cir. 1995)] (internal citation and quotation omitted). Of these factors, the most "critical" is the second: centralized control of labor. *Id*. at 1240–41. Indeed, the Circuit has stated that "the critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Id*. (quoting *Trevino v. Celanese Corp*., 701 F.2d 397, 404 (5th Cir. 1983)); *see Brown* [*v. Daikin America Inc*.,] 756 F.3d [219,] 227 [(2d Cir. 2014)] (control of labor relations is the central concern). At the pleading stage, however, a plaintiff need not plead that the parent exercises "total control" over hiring decisions as long as she pleads facts supporting a reasonable inference that there is "an amount of participation by the parent that is sufficient and necessary to the total employment process." *Brown*, 756 F.3d at 227 (quoting *Cook*, 69 F.3d at 1241). Often, whether a parent entity exercises sufficient control over a subsidiary such that the two are a single entity is 'a question of fact not suitable to resolution on a motion to dismiss.' *Id*.").

fails to state an actionable claim against any Defendant.

Retaliation Claims

Plaintiff claims to have suffered various forms of discrimination on the basis of sex. However, her Amended Complaint sounds primarily in retaliation (or, as will be discussed below, *quid pro quo* sexual harassment), and purports to allege what are really two instances of retaliation: The first, flowing from alleged protected activity by Plaintiff on August 21, 2019, consisting of her "refusal to succumb to Mr. McCauley's sexual advances," and the second flowing from her protected activity on February 8, 2021, when she made a formal complaint to Fortive about sexual harassment.[21]   In general, to state a claim for retaliation under either Title VII or NYSHRL,

> [a] plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015); *see Kessler*, 461 F.3d at 205-06. An employment action is adverse in the retaliation context if a plaintiff "show[s] that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (emphasis in original). For example, "a poor performance evaluation could very well deter

---

[21] *See, e.g.,* Amended Complaint at ¶ 290 (Asserting that Defendants "retaliated against Plaintiff on the basis of her protected activities, including, but not limited to, her refusal to succumb to Mr. McCauley's sexual advances, as well as her internal and external complaints.").   The Court understands the reference to "internal and external complaints" to refer to the fact that Plaintiff complained to both Fortive and the EEOC, though the pleading does not include any particular allegations concerning alleged retaliation related to an EEOC complaint.   Indeed, the only reference to an EEOC complaint is in ¶ 33 of the Amended Complaint, wherein it states that such a complaint was filed, but does not indicate when. Also, while the pleading asserts that the protected activity is "not limited to" the two referenced instances of protected activity (resisting sexual advances and filing "internal and external" complaints), it fails to plausibly allege any other protected activity.

a reasonable worker from complaining." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015). At the motion to dismiss stage, "[c]ausation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018).

*Curry-Malcolm v. Rochester City Sch. Dist.*, No. 21-2683, 2023 WL 3698213, at *2 (2d Cir. May 30, 2023).

*The First Alleged Period of Retaliation (Aug. 21, 2019 – Feb. 7, 2021)*

As already discussed, Plaintiff alleges that on August 21, 2019, she refused McCauley's sexual advances, and that subsequently, over the next eighteen months, she experienced a series of retaliatory adverse employment actions causally related to such refusal.   The Fortive Movants contend, *inter alia*, that the pleading fails to state an actionable claim of retaliation flowing from such alleged protected activity, since "rejection of a sexual advance does not constitute protected activity."   The Danaher Movants further maintain that, to the extent the Amended Complaint purports to allege that Cepheid, Phenomenex or Pall were involved in this aspect of the alleged retaliation, the pleading fails to plausibly allege that they had notice of Plaintiff's protected activity or that they took any retaliatory action.

Plaintiff opposes the motions and insists, in relevant part, that her opposition to McCauley's alleged sexual advances on August 21, 2019, constituted protected activity.

The Court disagrees with Defendants insofar as they maintain that rejection of a sexual advance can never qualify as protected activity.   However, the Court agrees that in the instant case Plaintiff has not plausibly alleged that she engaged in protected activity by refusing a sexual advance by McCauley.

As noted earlier, the first two elements of a retaliation claim are participation in protected activity of which the defendant is made aware.  Where, as here, Plaintiff did not file a contemporaneous formal discrimination complaint, to find that Plaintiff engaged in protected activity that was known to Qualitrol and/or Fortive, the Court must find that the Amended Complaint plausibly alleges both that Plaintiff had a good faith, objectively reasonable belief that McCauley's alleged sexual advances (on August 21, 2019) violated Title VII and the NYSHRL, and that she communicated such belief to McCauley in a manner that sufficiently indicated she was opposing sexual harassment. *See*, *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999 ("To establish the first of these elements—participation in a protected activity—Wimmer need not prove that the conditions against which he protested actually amounted to a violation of Title VII. Rather, Wimmer must demonstrate only that he had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.") (citations and internal quotation marks omitted); *see also, Ziparo v. CSX Transportation, Inc.*, 15 F.4th 153, 159 (2d Cir. 2021) (Indicating that "reasonableness" "is an objective standard, unconcerned with the actor's motivations or the sincerity of her beliefs."); *Leroy v. Delta Air Lines*, No. 21-267-CV, 2022 WL 12144507, at *4 (2d Cir. Oct. 27, 2022) ("Even if a complaint is ultimately without merit, lodging the complaint is a protected activity so long as it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful.  The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances and is evaluated from the perspective of a reasonable similarly situated person.") (citations and internal quotation marks omitted);

*Jones v. New York City Health & Hosp. Corp.*, No. 00 CIV. 7002, 2003 WL 30412, at *4 (S.D.N.Y. Jan. 3, 2003) ("Unless Plaintiff can show that her complaints *were based on an allegation of gender discrimination* (in which case they would be entitled to protection), and that her employers understood or should have understood them as such, she cannot assert retaliation.") (emphasis in original), *aff'd sub nom. Jones v. New York City Health & Hosps. Corp.*, 102 F. App'x 223 (2d Cir. 2004); *Stancu v. New York City/Parks Dept*, No. 20-CV-10371(ALC), 2022 WL 4581844, at *6 (S.D.N.Y. Sept. 29, 2022) ("Employee complaints can qualify as protected activity where (i) the employee had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII, and (ii) the employer understood, or could reasonably have understood, that the employee's opposition was directed at conduct prohibited by Title VII.") (citations and internal quotation marks omitted).

Judges in this Circuit are divided as to whether a rejection of a sexual advance can qualify as protected activity, but the majority view is that it may. *See, e.g., Campo v. City of New York*, No. 19CV04364NGGSJB, 2022 WL 970730, at *9 (E.D.N.Y. Mar. 31, 2022) (Describing the position that refusal of a sexual advance constitutes protected activity as "the majority position."); *accord, Areu v. Fox News Network*, 20-CV-8678 (RA), 2021 WL 4124226 at *12 (S.D.N.Y. Sep. 9, 2021).

However, the pleading must plausibly allege, first, that it was reasonable for the plaintiff to believe a sexual advance was actually made, and, second, that the plaintiff resisted the advance in such a way as to communicate that she was resisting unlawful sexual harassment.   Courts in this Circuit have dismissed retaliation claims that were

deficient in either respect.   For example, courts have dismissed such retaliation claims where the plaintiff failed to plausibly allege that the defendant actually made an unlawful sexual advance:

> [T]his Court is of the firm view that refusing a sexual advance may indeed amount to protected activity. But even when reading the Complaint in the light most favorable to Areu, the Court cannot conclude that Areu has plausibly alleged refusal of a sexual advance from Carlson. To begin with, Carlson did not proposition Areu. While he allegedly mentioned that he was staying alone in his hotel room in New York, he did not invite her to his hotel room—or anywhere for that matter—nor did he even identify the hotel at which he was staying.   The Court is well aware that many sexual propositions are subtle, but the mere mention—in the presence of others— of staying alone in an unnamed hotel does not suffice in these circumstances. It is true that Areu alleges that just prior to this statement, Carlson "began changing his clothes in front of [her] and one other male employee."   Changing clothes in front of someone while mentioning staying alone in a hotel could surely, in many a circumstance, amount to a sexual advance. But if Carlson, just off his program, had changed clothes in a fashion that was either revealing or at all sexually suggestive, the Court assumes that Areu would have so alleged. She has not. Although Carlson's alleged conduct could conceivably be consistent with a sexual advance, albeit subtle, it is also "just as much in line" with innocuous, lawful behavior in these particular circumstances. *See Twombly*, 550 U.S. at 554.

*Areu v. Fox News Network, LLC*, No. 20-CV-8678 (RA), 2021 WL 4124226, at *13 (S.D.N.Y. Sept. 9, 2021).

Similarly, courts have dismissed such claims where the pleading failed to plausibly allege that the plaintiff's "resistance" to the alleged sexual advance communicated opposition to sexual harassment:

> Qorrolli contends that she engaged in protected activity by rebuffing Orantes' unwelcome sexual advances on numerous occasions. Qorrolli admits, however, that Orantes never directly propositioned her, and that she

never uttered a verbal complaint to what she characterizes as his sexual advances. She reports that she rebuffed Orantes indirectly by using silence, freezing him out, or turning her face away. This evidence would not permit a jury to find that Qorrolli was communicating, with sufficient clarity, her opposition to sex discrimination or sexual harassment.

*Qorrolli v. Metro. Dental Assocs., D.D.S. - 225 Broadway, P.C.*, No. 18CV6836 (DLC), 2021 WL 6064520, at *4 (S.D.N.Y. Dec. 22, 2021), *reconsideration denied*, No. 18CV6836 (DLC), 2022 WL 125823 (S.D.N.Y. Jan. 13, 2022); *see also, Areu v. Fox News Network, LLC*, No. 20-CV-8678 (RA), 2021 WL 4124226, at *13 (S.D.N.Y. Sept. 9, 2021) ("[E]ven assuming Areu has plausibly alleged that Carlson was in fact suggesting a sexual encounter with him (whether it was that evening or at some point in the future), she has not pled that, in response, she took any action to protest or oppose statutorily prohibited discrimination.   The only action Areu cites is the ambiguous assertion that "she refused to play along."   To be clear, in certain cases, silence or a refusal to engage with a sexual proposition—perhaps a failure to go to a hotel room upon an invitation—may convey a rejection of that proposition.   But for silence or a refusal to "play along" to be fairly interpreted as an opposition to or rejection of a sexual advance, either the advance or the refusal must be sufficiently clear so as to permit an inference that opposition to sex discrimination was communicated to the defendant. *See Lenzi*, 944 F.3d at 113 (protected activity only if employer could "reasonably have understood" that employee was complaining about discrimination).") (citations and internal quotation marks omitted).

In the instant case, when considering whether the Amended Complaint satisfies these initial pleading requirements for a retaliation claim (protected activity and notice), the Court observes preliminarily that, "[g]enerally, both within and outside of this Circuit,

as to allegations of sex discrimination, courts have found it unreasonable for an individual to believe that a single, isolated incident could constitute a Title VII violation." *Brantman v. Fortistar Cap., Inc.*, No. 15-CV-4774 (NSR), 2017 WL 3172864, at *5 (S.D.N.Y. July 22, 2017) (collecting cases).

Here, the alleged incident between Plaintiff and McCauley on August 21, 2019, is the very definition of an "isolated incident."   The alleged sexual advances by McCauley occurred on a single day, over a period of an hour or two at most.

Besides that, the Amended Complaint does not allege facts from which Plaintiff could have reasonably believed that McCauley was violating Title VII or the NYSHRL even on that single occasion.   In that regard, the Amended Complaint contains many conclusory assertions characterizing McCauley's behavior as heinous sexual misconduct.[22]   In terms of *facts*, however, the pleading states only that McCauley, after telling Plaintiff that he wanted her opinion about the apartment, which he had never previously seen,[23] asked Plaintiff to come into the apartment's bedroom, and later, during lunch, asked Plaintiff whether she was married or had a boyfriend.   For numerous reasons the Court finds that these allegations do not plausibly indicate that Plaintiff had a good faith, reasonable belief that such actions constituted unlawful sexual harassment prohibited by Title VII or the NYSHRL.

To begin with, the Court is struck by the lack of factual allegations that might make

---

[22] *See, e.g.*, Amended Complaint at ¶ 2 (Referring to McCauley's "wildly inappropriate sexual advances.").
[23] The pleading indicates both that McCauley said he had never seen the apartment, and that McCauley had to obtain a key to the apartment from the building manager's office before he and Plaintiff to gain access to the apartment.

it plausible, as opposed to merely possible, to believe that McCauley's behavior at the apartment was a sexual advance.   For example, the pleading does not indicate whether the apartment, which had been vacated by the prior President of Qualitrol, was furnished or completely empty.   Plaintiff evidently wishes the Court to infer that the bedroom was furnished with a bed, but offers no facts that would make such an inference reasonable. Nor does the pleading indicate whether McCauley, who had expressly indicated that he wanted Plaintiff's opinion about the apartment generally, only asked Plaintiff to come into the bedroom, or whether he also asked her to come into other rooms besides the bedroom.   Again, the pleading wishes the Court to merely assume that McCauley only asked Plaintiff into the bedroom.

More importantly, the pleading fails to allege that McCauley said or did anything else at the apartment that would be consistent with a sexual advance.   The pleading does not allege, for instance, that McCauley ever mentioned sex.   Indeed, the Amended Complaint does not indicate that McCauley said *anything* of an overtly sexual nature to Plaintiff at that moment, despite being alone with her at what she maintains was the site of an intended tryst.   The pleading does not indicate the McCauley said anything about Plaintiff's body or her appearance, nor does it allege that McCauley attempted to touch Plaintiff or prevent her from leaving the apartment.

On these facts, Plaintiff's description of the event as a "sexual advance" amounts only to her subjective characterization of circumstances that are just as consistent with innocent behavior. *See, Lilakos v. New York City*, 808 F. App'x 4, 8 (2d Cir. 2020) ("Plaintiffs' allegations of being 'singled out' and 'targeted' are conclusory and cannot be

accepted as true at the motion to dismiss phase.").

In the face of this, Plaintiff's counsel, in his opposing memorandum, attempts to embellish the pleading by asserting that McCauley "repeatedly insisted that Ms. Reed join him in the bedroom of his corporate apartment *to engage in sexual conduct with her*."[24] However, no such factual allegation appears anywhere in the paragraphs of the Amended Complaint to which counsel cites or anywhere else in the pleading, and, as discussed earlier, counsel cannot supplement the pleading in this manner.[25]   The pleading simply does not plausibly allege that McCauley asked Plaintiff to come into the bedroom *for sex*.

The Amended Complaint also fails to plausibly allege that McCauley made a sexual advance toward Plaintiff later, during a lunch discussion, by asking her whether she was married or had a boyfriend.[26]   That is, it would not have been reasonable for Plaintiff to view such a relatively innocuous question as sexual harassment prohibited by Title VII or the NYSHRL. *See, Abeln v. Ultra Life Batteries*, No. 07-CV-6113L, 2009 WL 857497, at *2 (W.D.N.Y. Mar. 30, 2009) ("[C]ourts exploring the issue of protected activity have consistently concluded that a single, isolated inappropriate comment is generally insufficient to engender a reasonable belief that a Title VII violation has occurred.") (collecting cases); *see also, Sosa v. New York City Dep't of Educ.*, 819 F. App'x 30, 35 (2d Cir. 2020) ("Title VII does not set forth a general civility code for the American

---

[24]  Pl. Memo of Law, ECF No. 31 at p. 11 (citing to ¶¶ 81-87 of the Amended Complaint) (emphasis added).
[25]  *See, e.g., Lee v. Mikimoto (Am.) Co*., No. 22-CV-01923-PAC, 2023 WL 2711825, at *7 (S.D.N.Y. Mar. 30, 2023) ("It is well-settled that a plaintiff 'cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [a] motion to dismiss.'") (citation omitted).
[26]  The pleading conclusorily suggests that such question was just one aspect of McCauley's alleged "sexual advance" at the restaurant, but if there were any additional supportive facts Plaintiff would have undoubtedly included them.

workplace, and simple teasing or offhand comments will not amount to discriminatory changes in the terms and conditions of employment.") (citations and internal quotation marks omitted).   Consequently, even assuming that Plaintiff complained to McCauley that day about his question regarding her marital status, such complaint would not amount to protected activity.

However, the Amended Complaint also fails to plausibly allege facts indicating that Plaintiff complained to McCauley about anything he said or did that day, let alone that she did so in a manner that would have indicated she was opposing perceived sexual discrimination or harassment.   In that regard, Plaintiff maintains, in both her Amended Complaint and her response to the Fortive Movants' motion, that she reacted to McCauley's request to come to the apartment bedroom by simply leaving the apartment.[27] The pleading does not indicate that Plaintiff said anything in particular to McCauley before doing so.   Similarly, the Amended Complaint lacks any factual detail about what, if anything, Plaintiff actually said to McCauley in response to his question about whether she was married or had a boyfriend. Instead, the pleading merely asserts that, "[f]or her part, Ms. Reed continued to make clear that she would not submit to Mr. McCauley's sexual advances."[28]   Such a vague and conclusory assertion need not be accepted as true, and does not plausibly indicate that Plaintiff said or did anything from which

---

[27] *See*, Amended Complaint at ¶ 87 ("Ms. Reed refused each time and finally just walked out of the apartment."); *see also*, Memo of Law, ECF No. 31 at p. 3 ("McCauley walked into the apartment's bedroom and told Ms. Reed to join him inside the bedroom.   Ms. Reed refused.   Following her refusal, McCauley repeatedly demanded that Ms. Reed join him in the bedroom.   Ms. Reed decided to walk out of the apartment to escape the sexual harassment.").   Devoid of their conclusory aspects, these assertions indicate only that Plaintiff "opposed" McCauley's alleged harassment by leaving the apartment.
[28] Amended Complaint at ¶ 89.

McCauley could have understood that Plaintiff was opposing sexual discrimination or harassment prohibited by Title VII or the NYSHRL. *See, Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) ("[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.").

Again, the pleading's lack of detail on these points is striking, since there can be no doubt that the alleged sexual advance by McCauley on August 21, 2019, is the centerpiece of Plaintiff's lawsuit.   Indeed, the opening paragraphs of the Amended Complaint assure the reader that this lawsuit arises from "wildly inappropriate sexual advances" by McCauley on that date.   However, Plaintiff utterly fails to support that rhetoric with plausible factual allegations.   This glaring lack of factual detail concerning the primary event of Plaintiff's lawsuit seems especially odd to the Court, considering that the Amended Complaint is rife with extraneous details about more-trivial-and-irrelevant topics, such as what type of car McCauley drove (a Mustang) and the various jobs that Plaintiff held prior to even working for Qualitrol.

In sum, with regard to pleading protected activity and notice, Plaintiff has not "nudged [her] claims across the line from conceivable to plausible." *See, Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").   Consequently, the Court finds that the Amended Complaint fails to plausibly allege a claim of retaliation flowing from protected activity on August 21, 2019, against any defendant.

*The Second Alleged Period of Retaliation (Feb. 8, 2021 – Apr. 12, 2021)*

Plaintiff maintains that the second period of retaliation began eighteen months later, after she notified Fortive that she was claiming to have suffered sexual harassment at Qualitrol.   The Amended Complaint alleges that Plaintiff subsequently experienced retaliation consisting of the following: 1) Fortive conducted a biased investigation into Plaintiff's discrimination complaint; 2) Qualitrol re-scheduled and then shortened a presentation that Plaintiff was going to make at a sales conference; 3) McCauley sabotaged Plaintiff's attempts to find new jobs with Pall and Cepheid by pressuring those companies not to hire her; 4) Qualitrol updated company job descriptions to include functions which were associated with Plaintiff's job title, suggesting an intent to terminate Plaintiff; and 5) Qualitrol/Fortive added monitoring software and other software to Plaintiff's work computer.

As to this claim, unlike with the earlier period of alleged retaliation, there does not appear to be any dispute that Plaintiff engaged in protected activity by making a formal complaint to Fortive.   Accordingly, the first two elements of a retaliation claim have been pleaded as to Fortive, though not necessarily as to Qualitrol or McCauley.   Nevertheless, Fortive Movants contend that the Amended Complaint fails to plead a retaliation claim flowing from such protected activity, since it does not plausibly allege that Plaintiff experienced retaliation that was materially adverse and causally related to her complaint. For example, with regard to the causation element, Fortive Movants indicate that Plaintiff's allegations, made "upon information and belief," that Fortive Movants influenced the Danaher Movants not to hire Plaintiff, are completely speculative and implausible.

39

Meanwhile, as noted earlier, the Danaher Movants maintain that the pleading fails to state a retaliation claim against them, since it does not plausibly allege that they had notice of Plaintiff's protected activity or that they took any retaliatory action.[29]

Plaintiff insists, however, that she suffered "many adverse [retaliatory] actions" that were not "mere trivial harms."   Plaintiff contends, in particular, that the alleged retaliatory actions consisted of reducing her job responsibilities, "sabotaging her efforts to find a new job," "placing invasive monitoring programs on her computer," and constructively discharging her.   Plaintiff further maintains that all Defendants had notice of her protected activity, and that the retaliatory actions are causally related to her protected activity by temporal proximity.

Regarding the Danaher Movants in particular, Plaintiff argues that she has plausibly alleged their active involvement in the retaliation, since, for example, Cepheid sent her a rejection notice the day after she told Fortive that she had retained an attorney, and that same day she saw that the Cepheid position was still listed on an employment website.   Plaintiff also insists that she has plausibly alleged notice and a causal nexus between her complaint and Pall's failure to hire her, based on McCauley's alleged social connections to individuals at Danaher and the fact that Pall's decision not to hire her occurred around the same time that she was being interviewed by Ms. Kappelman.

However, the Court agrees with Defendants that the Amended Complaint fails to

---

[29] *See, e.g.*, Memo of Law, ECF No. 27-1 at p. 5 ("Reed does not allege that any of these three companies had knowledge of any protected activity on her part.   Rather than pleading facts to support claims of discrimination and retaliation, Reed's Amended Complaint continues to rely wholly on speculation – and illogical speculation at that.").

plausibly state actionable retaliation related to Plaintiff's discrimination complaint.   In that regard, as already indicated there is no dispute that Plaintiff made a complaint, or that Fortive was aware of the Complaint.   However, both Fortive Movants and Danaher Movants contend that the pleading fails to plausibly indicate that Danaher Movants were aware of Plaintiff's protected activity, or that such knowledge influenced the decision by Pall and Cepheid not to hire Plaintiff.

The Court agrees, since this aspect of the pleading relies on multiple layers of conjecture and mere bald, unsupported assertions of a coordinated effort between McCauley and his alleged acquaintances at Danaher to harm Plaintiff.   There are no non-conclusory allegations of fact that such communications ever actually occurred.   For that matter, there is no non-conclusory allegation that McCauley personally knew about Plaintiff's complaint to Fortive[30] or her job applications to the Danaher companies.[31] However, even if it were plausibly alleged that McCauley knew about Plaintiff's complaint and her job applications, it is simply not reasonable to infer that because McCauley may have known people at the Danaher companies, he must have contacted them, told them about Plaintiff's discrimination complaint against him, and influenced them not to hire Plaintiff.

The completely-speculative and implausible nature of Plaintiff's allegations in this

---

[30] The pleading asserts that Plaintiff made her sex discrimination complaint to Doug Hicks, Esq., "General Counsel at Fortive." Amended Complaint at ¶ 226.   Fortive Movants indicate that Hicks is actually not General Counsel at Fortive, but, rather, that he is General Counsel for Qualitrol.   If Fortive Movants are correct then Qualitrol would have had notice of Plaintiff's complaint, but if Plaintiff is correct then Qualitrol would not have necessarily gotten notice of her complaint merely by virtue of Hicks' involvement.
[31] The pleading actually contains no non-conclusory allegation that anyone at Qualitrol or Fortive was aware that she had applied to jobs at the Danaher companies.

regard is exemplified by ¶ 205 of the Amended Complaint where Plaintiff alleges that at some unspecified time the former President of Qualitrol, Ms. Rae, "told Ms. Reed it was customary for hiring managers at the other related companies *to contact Mr. McCauley* to ensure any job switches were permissible on his end." (emphasis added).   However, the pleading indicates that Rae was McCauley's predecessor, and that she left her position at Qualitrol before McCauley was hired,[32] making it entirely implausible that Rae could have had any knowledge of what McCauley's customary practices were at Qualitrol, or what the practices of persons at the Danaher companies were in relation to McCauley.

Nor do the circumstances alleged by Plaintiff, such as the timing of notices she received from Cepheid, plausibly indicate notice (of protected activity) and causation as to the Danaher Movants, which are completely separate companies from Fortive and Qualitrol.   Rather, it is neither surprising nor indicative of a causal connection that Plaintiff received rejection notices from Cepheid and/or Pall at around the same time that Fortive was investigating her discrimination complaint, since she filed her job applications with Danaher at approximately the same time that she filed her discrimination complaint with Fortive. *See, Malcolm v. Ass'n of Supervisors & Administrators of Rochester*, No. 17-CV-6878L, 2021 WL 4867006, at *5, n. 2 (W.D.N.Y. Oct. 19, 2021) ("[W]hile 'temporal proximity, without more,' may be sufficient to suggest an inference of discrimination for purposes of a claim for retaliatory termination, 'temporal proximity, with less' – that is, vague allegations of potential temporal proximity, eroded by a plaintiff's own factual

---

[32] Amended Complaint at ¶ ¶ 57-59, 72.

allegations that suggest coincidental timing, . . . is insufficient to nudge plaintiff's claims across the line from conceivable to plausible.") (citation and internal quotation marks omitted), *aff'd sub nom. Curry-Malcolm v. Rochester City Sch. Dist.*, No. 21-2683, 2023 WL 3698213 (2d Cir. May 30, 2023).

Nor, contrary to what Plaintiff suggests, is it evidence of a causal nexus that the job at Cepheid for which she had applied was still listed as available on LinkedIn after Cepheid sent her a rejection notice.   In that regard, Plaintiff implies that because the position was still listed the same day she received Cepheid's rejection notice, Cepheid must have lied when it told her the position was filled or cancelled, suggesting notice and causation.   However, even assuming *arguendo* that jobs are invariably removed from LinkedIn the same day they are filled or cancelled, which Plaintiff has not alleged, the Court nevertheless disagrees with Plaintiff, since the actual notice that Plaintiff received from Cepheid did not state that the position had been filled or cancelled.   Rather, according to the Amended Complaint, the message stated "that the company [had] decided to move forward with other candidate *or* cancelled the position."   The wording of the statement alone suggests that it is a form rejection notice, but in any event, a statement by a company that it has decided to "move forward with another candidate" does not necessarily mean that the position has already been filled.   Rather, it can also mean just that the recipient of the notice has not been selected.

In short, the pleading's allegations concerning the alleged retaliation by Danaher Movants are not plausible, and the retaliation claims against Danaher Movants are

dismissed.[33]

As for the remaining alleged acts of retaliation by Fortive Movants, the Court similarly finds that they are not plausibly pleaded.   For example, Plaintiff insists that in retaliation for her complaint, Fortive treated her unfairly, such as by intentionally hiring a biased, pro-defense attorney, Ms. Kappelman, to investigate her claim.   As evidence of Kappelman's alleged bias, Plaintiff asserts that Kappelman aggressively challenged certain aspects of Plaintiff's complaint.   Plaintiff apparently believes that Fortive and Kappelman should have simply accepted at face value her unsubstantiated accusations concerning an event that had allegedly occurred almost two years earlier, about which she had never previously complained.   However, in reality, investigators are required to ask tough questions, and that fact that Kappelman may have asked Plaintiff such questions does not imply that she was biased.   Nor does the pleading otherwise plausibly indicate that Fortive Movants delayed, thwarted or otherwise did anything improper concerning the investigation of Plaintiff's complaint.[34]

In any event, Plaintiff's retaliation claim fails on this point as a matter of law, since the Second Circuit has held that "failure to investigate an employee's complaint is not retaliation for filing that same complaint." *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 57 (2d Cir. 2016); *see also, Fincher v. Depository Tr. & Clearing Corp.*, 604

---

[33]  The pleading's allegations are similarly speculative and implausible as to any non-retaliation discrimination claims against Danaher Movants, the elements of which will be discussed later. Accordingly, the Amended Complaint is dismissed in its entirety as to Danaher Movants.

[34]  Notably, Plaintiff did not even wait for Fortive to reach any conclusions about her complaint before she filed her administrative complaint and then proceed to court.   Of course, Plaintiff was free to do that, but Fortive's failure to complete its investigation on Plaintiff's timetable fails to plausibly indicate any retaliatory intent.

F.3d 712, 721 (2d Cir. 2010) ("We are of the view nonetheless that, at least in a run-of-the-mine case such as this one, an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint.").

The Court also agrees with Fortive Movants that the pleading fails to plausibly allege a sufficient causal nexus between the protected activity and several of the remaining alleged retaliatory acts.   In that regard, the Amended Complaint does not attempt to allege any direct evidence of such a causal nexus, but, instead, relies on temporal proximity.   However, several of the alleged retaliatory acts –the re-scheduling of Plaintiff's presentation at the sales conference, the alleged re-stating of job descriptions to include functions previously performed by Plaintiff, and the cancellation/rescheduling of meetings[35]-- are mere continuations of the same alleged pattern of retaliation that Plaintiff claims began eighteen months *before* she filed her discrimination complaint. That is, the pleading indicates that Plaintiff filed her formal complaint with Fortive precisely because she had endured eighteen months of alleged retaliation in which Qualitrol was "virtually eliminating" her role within the company.

Such allegations fail to show a causal nexus between Plaintiff's complaint and these actions, since it is well settled that "temporal proximity alone does not create an inference of causation where gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity." *Czerwinski v. New York State Dep't of Corr.*

---

[35] *See, e.g.*, Amended Complaint at ¶ 261 ("[V]arious standing meetings were cancelled with no explanation and other were rescheduled to include Vice Presidents who would not ordinarily have attended the meetings.").

& Cmty. Supervision, No. 6:18-CV-0635, 2022 WL 685287, at *4 (N.D.N.Y. Mar. 8, 2022) (quoting Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001)). Accordingly, to the extent that Plaintiff is relying on the alleged reduction of her job duties after she made her formal complaint to Fortive, the Court finds that the temporal proximity of such action to Plaintiff's complaint does not plausibly indicate a causal nexus, since Plaintiff clearly maintains that such reduction-of-duties began, in various forms, more than a year before her complaint to Fortive.[36]

Nor has Plaintiff otherwise plausibly alleged facts from which a causal nexus could be inferred.    For example, the pleading does not identify the persons within Qualitrol who made the complained-of decisions or explain how such persons would have had notice of Plaintiff's complaint to Fortive.   In sum, Plaintiff has not plausibly alleged that the changes to her presentation schedule at the sales conference, or the changes to various job descriptions within Qualitrol, were causally connected to her protected activity, even assuming arguendo that such actions were sufficiently materially adverse, which the Court also does not believe has been plausibly alleged.

Therefore, as far as alleged post-complaint retaliatory acts by Fortive Movants, this leaves only the alleged tampering with Plaintiff's work computer.   Again, the Amended Complaint alleges that such tampering consisted of the addition of "several monitoring programs and additional users"; the "removal" of the computer's hard drive to make a "shadow copy"; the establishment of a "domain peer use"; the "accessing" of Plaintiff's

---

[36]  The Court has already rejected Plaintiff's contention that she had previously engaged in protected activity on August 21, 2019.

VPN user tokens, desktop, hard drive, and cloud files; the addition of two "patch updates"; and the addition of "monitoring programs" that could log keystrokes, turn on Plaintiff's audio driver, and access Plaintiff's photos and audio.

With regard to these alleged actions, Fortive Movants note, preliminarily, that Plaintiff has not alleged that the supposedly-retaliatory contact with her work computer "prevented her from utilizing the computer to perform work."[37]   Beyond that, Fortive Movants argue that the pleading "fail[s] to articulate how [such actions] would dissuade a reasonable employee from making or supporting a charge of discrimination."[38]   Finally, Fortive Movants maintain that, except insofar as Plaintiff attempt to rely on temporal proximity, she has not plausibly alleged that such actions are causally related to her protected activity.

Fortive Movants' argument on this point raises two issues:   Whether the Amended Complaint plausibly alleges that Plaintiff suffered an adverse employment action based on the alleged tampering with her computer, and, if so, whether the Amended Complaint also plausibly alleges that such adverse action is causally related to Plaintiff's sexual harassment complaint.   Because the Court agrees with Fortive Movants on the first issue, it does not address the second issue.[39]

In considering whether the pleading adequately maintains that Plaintiff suffered an

---

[37] ECF No. 25 at p. 23.
[38] ECF No. 25 at p. 24.
[39] Although, the Court believes the pleading is deficient in this respect as well.   For example, as evidence of causation Plaintiff wants the Court to infer that her computer was the only one affected by the software and/or hardware changes described in the Amended Complaint, but she does not allege that, not even in conclusory fashion or upon information and belief.

adverse employment action, the Court notes preliminarily that Plaintiff does not contend that the alleged changes to her work computer actually harmed her in some way, apart from violating her perhaps-misplaced sense of privacy in a piece of equipment belonging to her employer.   As Fortive Movants have indicated, Plaintiff does not allege that the purported tampering with her computer affected her ability to do her job.

In any event, the Court finds that the alleged computer tampering does not plausibly allege a retaliatory adverse employment action.   In this regard, Plaintiff's allegation is very similar to that of the plaintiff in *Fahrenkrug v. Verizon Services Corp.*, 5:11-cv-1014 (BKS/ATB), 2015 WL 13021890 (N.D.N.Y. May 14, 2015) ("*Fahrenkrug*"), who alleged that after she complained to her supervisor about sex discrimination, the employer began "tapping or recording" her work computer: "Plaintiff claims that Verizon retaliated for her complaints of gender discrimination . . . 'by suddenly ... tapping or recording [her] PC[.]'" *Id*. at *20; *see also, id*. at *4 ("She came to believe that Verizon was monitoring her computer, because she saw "a little indicator, it was some letters and characters, which [she] had never seen before" at the top of her computer, and "a Verizon IT person ... confirmed that meant that [she] was, in fact, being recorded.") (citation to record omitted).

However, the district court in *Fahrenkrug*, which characterized the alleged computer tampering as "excessive monitoring," rejected the plaintiff's claim on that point, stating:

> [T]he alleged monitoring of Plaintiff's computer is not an adverse employment action. *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 239 (W.D.N.Y. 2011) ("Excessive monitoring and oversight of work do not

constitute adverse employment action." (citations omitted)); *Mitchell v. Zia Park, LLC*, 842 F. Supp. 2d 1316, 1331-32 (D.N.M. 2012) (holding that increased surveillance of employee who worked in casino did not constitute adverse employment action).

*Fahrenkrug v. Verizon Servs. Corp.*, 2015 WL 13021890, at *20.   The United States Court of Appeals for the Second Circuit affirmed that ruling, stating in pertinent part: "Plaintiff argued that Defendants retaliated for her gender discrimination complaints by . . . monitoring or recording the computer that she used at work. We find that the District Court properly dismissed these claims on the basis that "[t]hese allegations, even if true, do not show an adverse employment action[.]" *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x at 57.[40]

The Court here similarly finds that Plaintiff's allegations regarding her computer, which amount to a claim of retaliatory "excessive monitoring," fail to plausibly allege a sufficiently material adverse retaliatory action.

Consequently, and for all the various reasons just discussed, Plaintiff's retaliation

---

[40]  *See also, Kershaw v. DeJoy*, No. 3:18-CV-1705 (AWT), 2021 WL 1197499, at *7 (D. Conn. Mar. 30, 2021) ("Here, the plaintiff had computer issues in the form of encountering black boxes and her computer becoming unresponsive, and she also noticed that someone had gone through paperwork on her desk and some paperwork was missing. There were no changes in the terms, privileges, or duration of the plaintiff's employment. Nor was there any material change in the conditions of the plaintiff's employment such as significantly diminished responsibility. What the plaintiff encountered was not sufficiently disruptive to rise to a level of a material adverse change in the conditions of her employment."); *Stern v. State Univ. of New York*, No. 16CV5588NGGLB, 2018 WL 4863588, at *16 (E.D.N.Y. Sept. 30, 2018) ("Plaintiff's allegations of excessive monitoring and scrutiny of her timesheets, including that SUNY-DMC conducted a search of her work computer, are not adverse employment actions."); *Friel v. Cnty. of Nassau*, 947 F. Supp. 2d 239, 254 (E.D.N.Y. 2013) ("As to the Plaintiff's assertion that her computer usage was [retaliatorily] audited, the Court first acknowledges that numerous courts have found that subjecting an employee to an audit is not an adverse employment action.   This is because an adverse employment action must be something more than an everyday work occurrence.   In this regard, an audit is generally not considered an actionable form of retaliation, unless the audit results in demotion or termination.") (citations and internal quotation marks omitted; collecting cases).

claim against Fortive Movants arising from her discrimination complaint is dismissed for failure to state an actionable claim.

### Constructive Discharge

To the extent Plaintiff is attempting to assert a separate claim for constructive discharge, it is also dismissed for the reasons just discussed relating to the insufficiency of the retaliation claim. *See, Johnson v. Potter*, No. 04-CV-6634 CJS, 2009 WL 2180354, at *17 (W.D.N.Y. July 22, 2009) ("[S]ince the Court has already determined, both in the prior case and in the instant case, that the complained-of actions fail to establish actionable retaliation, Plaintiff's constructive discharge claim based on retaliation must also fail."), *aff'd*, 398 F. App'x 644 (2d Cir. 2010).

### Sexual Discrimination Claims

Plaintiff also alleges that Defendants committed several distinct forms of sexual discrimination, namely, *quid pro quo* sexual harassment, disparate treatment discrimination, and hostile work environment discrimination.   The general legal principles concerning such claims have been clearly stated as follows:

> Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions[,] or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). This provision requires that "gender ... be irrelevant to employment decisions," *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989), and allows claims of discrimination to rest on a number of factual grounds. The archetypal claim of discrimination in violation of Title VII is a claim of "disparate treatment," which occurs when an employer treats some employees less favorably than others because of their gender. *See United States v. Brennan*, 650 F.3d 65, 89–90 (2d Cir. 2011); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). In addition to disparate treatment, the Supreme Court has recognized that *quid pro quo* sexual harassment and hostile work

environment are forms of gender discrimination prohibited by Title VII, and such practices furnish independent causes of action. *See Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) ("[I]t is established 'without question, that when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminates on the basis of sex.'" (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (alterations omitted))); *see also Vinson*, 577 U.S. at 65 ("[S]exual misconduct constitutes prohibited 'sexual harassment,' whether or not it is directly linked to the grant or denial of an economic *quid pro quo*, where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " (quoting 29 C.F.R. § 1604.11(a)(3))).

Though claims challenging disparate treatment, *quid pro quo* sexual harassment, and hostile work environment are all claims of gender discrimination, they are distinct causes of action governed by different analytical standards. For example, to state a claim of gender discrimination based on *quid pro quo* sexual harassment, a plaintiff must allege that her employer took "a tangible employment action" because of her "refusal to submit to a supervisor's sexual demands." *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998)). And to state a claim for a hostile work environment,

> a plaintiff must plead facts that would tend to show that the complained of conduct: (1) "is objectively severe or pervasive—that is, ... creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's sex."

*Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001)). On the other hand, a gender discrimination claim based on disparate treatment requires a plaintiff to plead facts that would tend to show "that the defendant had a discriminatory intent or motive for taking a job-related action." *Brennan*, 650 F.3d at 90 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). The differing analytical standards governing each theory of gender discrimination mean

> that allegations sufficient to establish one claim, *e.g.*, disparate treatment, do not necessarily support an action based on another claim, *e.g.*, hostile work environment.

*Desouza v. Off. of Child. & Fam. Servs.*, No. 18CV2463PKCSMG, 2019 WL 2477796, at

*3–4 (E.D.N.Y. June 12, 2019).

### Quid Pro Quo Sexual Harassment

Plaintiff alleges that she experienced *quid pro quo* discrimination after she rejected

sexual advances by her supervisor, McCauley, on August 21, 2019.   Fortive Movants,

however, point out that,

> nothing in the Amended Complaint suggests that the invitations were sexual in nature or made due to Plaintiff's gender.   Even more fatal, Plaintiff fails to allege how her rejection of McCauley's alleged advances impacted the terms and conditions of her employment apart from mere inconveniences such as alleging that she was excluded from meetings and that her budget was cut.   , , ,   [T]here is no allegation that any purported changes in her job responsibilities came with a   demotion or . . . loss of wages.   To the contrary, Plaintiff's bases compensation increased by $25,000 over six years.   . . .   [T]here is no allegation that McCauley conditioned his alleged sexual advances on any job benefits.   Moreover, many of the alleged adverse actions were brought about by Downs or others.

ECF No. 25 at p. 16.   The Court agrees with Fortive Movants.

As mentioned earlier, "[a] *quid pro quo* Title VII sex discrimination claim requires

that 'the plaintiff-employee establish that she was denied an economic benefit either

because of gender or because a sexual advance was made by a supervisor and rejected

by her.'" *Lekettey v. City of New York*, 637 F. App'x 659, 661 (2d Cir. 2016) (*quoting*

*Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992), internal

quotation marks omitted).[41]

A *quid pro quo* harassment claim based on a rejection of a sexual advance fails, at the pleading stage, when the plaintiff has not plausibly alleged that she rejected a sexual advance. *See, e.g., Sutton v. Stony Brook Univ.*, No. 21-2055, 2022 WL 4479509, at *2 (2d Cir. Sept. 27, 2022) ("We conclude that Sutton has not plausibly alleged that she rejected "sexual advances." . . . Mangano's alleged sexual advances were only conclusory allegations of implied sexual advances. . . . In sum, taken as a whole, the allegations in the TAC and its related documents fail to rise above conclusory allegations of sexual behavior.").

Here, Plaintiff alleges that her *quid pro quo* claim arises from her denial of McCauley's sexual advances on August 21, 2019.  However, the Court finds that the Amended Complaint fails to plausibly allege such a claim, mostly for the same reasons the Court gave when finding that Plaintiff had failed to plausibly plead that she engaged in protected activity on that date.  That is, while Plaintiff makes conclusory assertions that McCauley made "wildly inappropriate sexual advances" toward her on August 21,

---

[41] *See also, Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (Indicating that a Title VII *quid pro quo* sexual harassment claim "requires proof of three elements: (1) the rejection of sexual advances; (2) a tangible . . . consequence; and (3) a causal connection between the two.") (citation omitted); *Harriram v. Fera*, No. 21-CV-3696 (RA), 2023 WL 2647856, at *4 (S.D.N.Y. Mar. 27, 2023) ("To state a *quid pro quo* claim, [the plaintiff] must show a 'tangible employment action,' *i.e.*, that an 'explicit alteration in the terms or conditions of employment' resulted from her refusal to submit to [the defendant's] sexual advances." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006). To raise an inference of discrimination, a *quid pro quo* harassment claim must establish a "causal connection" between the sexual advances and the employment action, either through a direct link or indirectly through temporal proximity. *Cook v. N.Y.C. Dep't of Educ.*, 90 F. App'x 562, 563 (2d Cir. 2004).").

2019, which she rejected, the factual allegations in the pleading do not support that characterization.   Again, the contention that a sexual advance was made is based on Plaintiff's subjective characterization of circumstances that are just as consistent with innocent behavior.[42]   Nor, in any event, does the pleading plausibly connect such alleged rejection of McCauley's advances to any adverse employment action.   Consequently, the *quid pro quo* sexual harassment claim is also dismissed.[43]

### *Disparate Treatment*

Plaintiff further contends that she suffered disparate treatment discrimination. Although, the Amended Complaint does not explicitly allege that Plaintiff was treated differently on the basis of her sex, *i.e.*, because she is a female.   In fact, the word "female" appears nowhere in the Amended Complaint.   Nor does the pleading otherwise purport to allege that Plaintiff was treated differently than some other similarly-situated male employee.   Indeed, the only time the word "male" appears in the Amended

---

[42] *Cf., Caimona v. Ohio Civ. Serv. Emps. Ass'n, AFSCME Loc. 11, AFL-CIO*, 814 F. App'x 130, 131 (6th Cir. 2020) (Affirming district court's grant of summary judgment: "Caimona's *quid pro quo* sexual harassment claim fails because all of the alleged harassing incidents (which are detailed in that opinion and incorporated by reference here) are based entirely on Caimona's subjective opinions and conjectures[.]   . . .   [A]s the district court pointed out, Caimona "specifically admitted that [his supervisor, Buffy] Andrews never made any sexual propositions to him or made any sexually suggestive comments about the two of them getting together." Additionally, "Caimona admitted at his deposition that Andrews never said anything to him directly or indirectly indicating she had any sexual interest in him, never kissed him or tried to do so, never told Caimona that she wanted to have a sexual relationship with him, never sent him any text messages, emails, photographs, letters, notes, or cards indicating she wanted to have a sexual relationship with him, never made any sexual propositions to him, never made any sexually suggestive comments to him about the two of them getting together, and never engaged in any teasing, kidding, or practical jokes with Caimona of a sexual nature." Thus, as the district court correctly concluded, "Caimona cannot show that any of the alleged harassment by Andrews was based on Caimona's sex," an essential element of his *quid pro quo* sexual harassment claim.") (citation omitted).
[43] Additionally, as previously noted, as far as can be gleaned from the Amended Complaint, McCauley never expressed the slightest annoyance toward Plaintiff and, indeed, never referenced or even acknowledged Plaintiff's supposed rejection of his sexual advances.   Because of this, the Court does not believe that temporal proximity alone can plausibly establish a causal nexus for Plaintiff's *quid pro quo* claim. Besides that, many of the alleged adverse actions occurred remote in time to the alleged rejection.

Complaint is when Plaintiff points out that the corporate leadership of Qualitrol and Fortive is predominantly male.[44]

Rather, the pleading asserts that Qualitrol and Fortive subjected Plaintiff to "disparate treatment because she refused to succumb to Mr. McCauley's sexual advances."[45]   In that regard, the Amended Complaint baldly asserts that Plaintiff was treated differently than other employees who did not refuse McCauley's advances (even though Plaintiff does not allege that McCauley made sexual advances to anyone else). *See*, Amended Complaint at ¶ 275 ("[T]he way that Ms. Reed has been treated is at odds with the way that Company [(Fortive/Qualitrol)] has invested in other areas – areas led by individuals who were not sexually harassed by Mr. McCauley, and who were not forced to rebuff his sexual advances.").   The pleading thus asserts that if a person at Qualitrol, male or female, was treated better than Plaintiff was, it is because Plaintiff was singled out for worse treatment because she refused McCauley's alleged sexual advances.

Defendants maintain that Plaintiff's theory lacks merit, since refusing a sexual advance does not make one a member of a protected class for purposes of disparate treatment discrimination.

Plaintiff opposes Defendant's motion, but in doing so, her memorandum of law now attempts to raise a new legal theory by asserting that Plaintiff was treated less favorably than male employees:

> Ms. Reed's Complaint alleges facts demonstrating that both Kevin Blanton and Matt Munson, similarly situated employees outside of Plaintiff's

---

[44] Amended Complaint at ¶ ¶ 16-17.
[45] Amended Complaint at ¶ ¶ 285, 295.

> protected class, were treated more favorably and handed responsibilities previously handled by Ms. Reed.  By way of example, Mr. Munson was made responsible for an initiative in 2019 that Ms. Reed had overseen the two years prior.  ¶ 126.  Likewise, Mr. Blanton was handed control of the Inside Sales team which had previously been under Mrs. Reed's purview. ¶ 150.

ECF No. 31 at 15.

However, this theory, which, again, is not expressly set forth in the Amended Complaint, is also not plausibly established by the factual allegations therein.   For example, Plaintiff's assertion that Munson received preferable treatment when he was assigned to handle Qualitrol's PD Initiative one time, in 2019, is almost laughably specious, since the pleading indicates that Plaintiff was selected for that role *three* times, in 2017, 2018, and 2020, and that Munson was terminated after "attempt[ing] to circumvent [Plaintiff's] authority."[46]   These facts hardly suggest that Munson received better treatment than Plaintiff at all, let alone on the basis of sex.

Similarly, Plaintiff's assertion that Blanton received better treatment than her on the basis of his sex when he was placed in charge of the Inside Sales Team is also unsupported by the Amended Complaint.   Rather, the pleading indicates that Blanton was placed in charge of the Inside Sales Team because that team, which had been under Plaintiff's supervision, was "way behind with respect to [its] goals" and had been "falsifying incremental revenue."   Under those circumstances, the fact that Qualitrol chose to place Blanton in charge of the group, rather than allowing Plaintiff to continue in that role, is not

---

[46] Amended Complaint at ¶ 144

suggestive of discriminatory animus.[47]   Besides that, the pleading also fails to allege that

Plaintiff and Blanton were otherwise similarly situated.   The pleading shows, rather, that

they were not, since Plaintiff was Qualitrol's Digital Marketing Manager and Blanton was

Qualitrol's Sales Director of the Americas.   Nor, more generally, does the pleading allege

that there was a male supervisor at Qualitrol, whose team was similarly "way behind" in

its goals and falsifying data, who was left in charge of that team.

Even more generally, Plaintiff's belated suggestion that male Qualitrol employees

were treated better than Plaintiff is simply not plausible, since most of the male employees

mentioned in the Amended Complaint were fired, while Plaintiff was never even

threatened with termination.   Indeed, the pleading does not indicate that any female

employee at Qualitrol was fired or demoted during the relevant period.

Moreover, while Plaintiff complains that her role at Qualitrol was "virtually

eliminated" due to discrimination, the person who seems to have benefited most from the

alleged reduction of Plaintiff's role was another female executive, Ms. Downs. *See*,

Amended Complaint at ¶ ¶ 155 (Employees were scheduled to report to Downs instead

of to Plaintiff); 165-168 (Downs ran the monthly Innovation Forum calls from which

Plaintiff was excluded, and later, after Plaintiff was allowed to attend over Downs'

objection, told Plaintiff not to speak during the calls); 173-174 (Downs had access to the

budget while Plaintiff did not); 184 (Downs replaced Plaintiff with regard to "highly visible

---

[47] Further weighing against any inference of discriminatory intent is the fact that McCauley told Plaintiff he thought she would think it "good news" that Blanton was being handed the problem.   Additionally, if, as Plaintiff contends, McCauley was truly looking for ways to retaliate against Plaintiff and eliminate her role within the company, this incident would have provided him a perfect opportunity to fire Plaintiff, which he did not do.

work" performed by Qualitrol "alongside Fortive"); 186 (Downs was invited to other meetings from which Plaintiff was excluded).   In fact, it can be reasonably inferred from the pleading that it was Downs, and not McCauley, who was responsible for much of the alleged "retaliation" about which Plaintiff complains in this action.

In sum, to the extent that Plaintiff is attempting to allege a disparate treatment claim based on the contention that she was treated less-favorably than male employees, she has not stated a plausible claim.   To the extent Plaintiff is attempting to assert a disparate treatment claim arising from her refusal of McCauley's alleged sexual advances on August 21, 2019, it is essentially duplicative of her retaliation and *quid pro quo* claims, which the Court has already dismissed after finding that the Amended Complaint fails to plausibly plead that Plaintiff was the target of a sexual advance by McCauley.   Either way, the disparate treatment claim is dismissed.

*Hostile Work Environment and Aiding/Abetting under the NYSHRL*

The Court has now dismissed all claims in the Amended Complaint except any that might be asserted under the NYSHRL that differ from the claims already analyzed under Title VII.   In that regard, the pleading expressly states a claim for aiding and abetting discrimination against McCauley under the NYSHRL.   Additionally, Plaintiff's response to Defendants' motions further contends that she has stated a hostile environment claim under the NYSHRL.

The Amended Complaint actually does not expressly purport to state a claim for hostile work environment discrimination at all, under either Title VII or the NYSHRL. Indeed, the only reference to such a claim in the pleading is a quote from an email that

Plaintiff sent to Fortive in February 2021 in which she referred to a "hostile work environment." Amended Complaint at ¶ 231.   Again, though, Plaintiff's response to Defendants' motions insists that she has pleaded such a claim under the NYSHRL. Plaintiff does *not* claim that she has stated a hostile environment claim under Title VII, and the Court accordingly construes her response as conceding that the Amended Complaint fails to state such a claim.   Therefore, any Title VII hostile environment claim is dismissed.

As discussed earlier sexual harassment claims Title VII and NYSHRL are generally analytically identical, with some exceptions.   One such exception is that hostile environment claims under the NYSHRL require a lesser showing than those under Title VII:

> The State Human Rights Law was amended to provide that harassment is actionable "regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims," and the plaintiff need demonstrate only that she or he was subjected to "inferior terms, conditions or privileges of employment" (Executive Law § 296[1][h]). This amendment, however, only applies to claims filed after the amendment's effective date of October 11, 2019 (see L 2019, ch 160, § 16[b], [d]).

*Golston-Green v. City of New York*, 184 A.D.3d 24, 41, 123 N.Y.S.3d 656, 669 (2020); *see also, id*. ("The State Human Rights Law was amended to provide that harassment is actionable 'regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims,' and the plaintiff need demonstrate only that she or he was subjected to 'inferior terms, conditions or privileges of employment' (Executive Law § 296[1][h]). This amendment, however, only applies to

claims filed after the amendment's effective date of October 11, 2019 (*see* L 2019, ch 160, § 16[b], [d]).").

   As another judge in this district recently observed, there are few reported cases applying this standard, but it is nevertheless clear that to state a hostile environment claim under the NYSHRL, the plaintiff must still plausibly allege that she was subjected to such inferior conditions "because of"[48] her sex:

> The court's research reveals few cases applying the amended "more permissive standard" for hostile work environment claims under NYSHRL. *See, e.g., Black v. ESPN, Inc.*, 139 N.Y.S.3d 523, at *6 (N.Y. Sup. Ct. 2021) (Table) (essentially applying the same standard used to analyze hostile work environment claims under New York City Human Rights Law ("NYCHRL")). In particular, "[t]o make out a hostile work environment claim, a plaintiff must allege that she or he has been subjected to inferior terms, conditions, or privileges of employment because of his or her protected status under the [amended] NYSHRL (NY Exec. L. 296[1][h] [applying to claims filed after the amendment's effective date of October 11, 2019]; ... or she or he has been treated less well than other employees because of her or his protected status.") *Id*. (citing cases).

*Alford v. NFTA-Metro*, No. 21-CV-737JLS(F), 2022 WL 17655868, at *6 (W.D.N.Y. Sept.

---

[48] Executive Law § 296(1)(h) states in pertinent part that: "1. It shall be an unlawful discriminatory practice: 1. It shall be an unlawful discriminatory practice: (h) For an employer . . . to subject any individual to harassment because of an individual's . . . sex, . . . or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. The fact that such individual did not make a complaint about the harassment to such employer, licensing agency, employment agency or labor organization shall not be determinative of whether such employer, licensing agency, employment agency or labor organization shall be liable. Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared. It shall be an affirmative defense to liability under this subdivision that the harassing conduct does not rise above the level of what a reasonable victim of discrimination with the same protected characteristic or characteristics would consider petty slights or trivial inconveniences." N.Y. Exec. Law § 296 (McKinney 2023).

6, 2022), report and recommendation adopted, No. 21-CV-737, 2022 WL 17626548 (W.D.N.Y. Dec. 12, 2022).

In the instant case, Plaintiff's theory of hostile environment is that McCauley subjected her to a sexual advance and then subjected her to adverse employment actions after she refused that advance.   More specifically, Plaintiff's memo of law submitted in opposition to Fortive Movants' motion states, regarding her hostile environment claim, that,

> Here, the sexual harassment to which Plaintiff was subjected —*essentially* being propositioned for sex—was severe and, more to the point, the resulting retaliatory abuse was so pervasive that a reasonable employee would find that the conditions of her employment were altered for the worse.

ECF No. 31 at p. 13 (emphasis added).[49]

However, the Court agrees with Defendants that the Amended Complaint fails to state a hostile environment claim.   To begin with, the claim as framed by Plaintiff is duplicative of her retaliation and *quid pro quo* claims, which the Court has already dismissed.   Additionally, while Plaintiff complains about numerous aspects of her employment that she experienced between October 2019 and February 2021, the Amended Complaint does not plausibly allege that such matters involved "inferior terms, conditions or privileges" that were discriminatorily imposed on her because of her sex.

In that regard, Plaintiff has not plausibly alleged, first, that her working conditions were actually "inferior" to those of other employees at Qualitrol during that period, or,

---

[49]  The Court finds Plaintiff's use of the word "essentially" here telling, relative to the earlier discussion concerning protected activity.   That is, the assertion that McCauley "essentially" propositioned Plaintiff for sex is a concession that he did not expressly proposition Plaintiff for sex.

second, that the incidents about which she complains were imposed on her because she is female or because she resisted a sexual advance by McCauley.

Indeed, with regard to most of the changes at Qualitrol affecting Plaintiff's working conditions about which she complains, the pleading does not plausibly allege that they were even "directed at" Plaintiff.   Rather, they appear to have been gender-neutral business decisions, including budget cuts and the reduction or restructuring of staff, that merely had some collateral tangential effect on Plaintiff's job.   In any event, for reasons already discussed the pleading also fails to plausibly allege that such changes were causally related to Plaintiff being female or to her resisting a sexual advance.   The NYSHRL hostile environment claim is therefore dismissed.

This leaves only Plaintiff's NYSHRL "aiding and abetting" claim against McCauley remaining.   In that regard, another distinction between Title VII and the NYSHRL is that the latter statute permits a claim for aiding and abetting discrimination against individuals who actually participate in the discrimination.[50]   Plaintiff here asserts such a claim against McCauley, for allegedly aiding and abetting all of the alleged discrimination described in

---

[50] *See, Rogers v. Bank of New York Mellon*, No. 09 CIV. 8551 (HBP), 2016 WL 4362204, at *7 (S.D.N.Y. Aug. 15, 2016) (""[I]ndividuals are not subject to liability under Title VII." *Sassaman v. Gamache*, 566 F.3d 307, 315–16 (2d Cir. 2009), quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)); *see Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) ("Title VII does not impose liability on individuals"); *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (Title VII claims against individual defendants were "properly dismissed ... because individuals are not subject to liability under Title VII"). "Unlike Title VII, [NYSHRL] § 296(6) has been construed by the Second Circuit to impose liability on an individual 'defendant who actually participates in the conduct giving rise to a discrimination claim.'" *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 380 (S.D.N.Y. 1999) (Leisure, D.J.) (emphasis added in original, citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011))," on reconsideration, No. 09 CIV. 8551 (HBP), 2017 WL 4157376 (S.D.N.Y. Sept. 19, 2017).

the Amended Complaint.   However, as already explained the Amended Complaint fails to plausibly any underlying discrimination claims, and therefore the claim against McCauley for aiding and abetting such alleged discrimination must also be dismissed.

CONCLUSION

For all of the foregoing reasons the Court finds that the Amended Complaint fails to state any actionable claim.   Defendants' motions (ECF Nos. 24 & 27) to dismiss the Amended Complaint are granted, and this action is dismissed with prejudice.   The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated:    Rochester, New York
          July 11, 2023

ENTER:

CHARLES J. SIRACUSA
United States District Judge